## No. 10,337.

THE TEXAS AND PACIFIC RAILWAY COMPANY, ET AL., VS. THE SOUTHERN PACIFC RAILWAY COMPANY.

All contracts which have a tendency to stifle competition, or to create or foster monopolies, with a view to unreasonably increase the market value of commodities, are against public interest and contrary to public policy, and hence such contracts can confer to the parties thereto no rights which courts of justice can recognize and enforce.

Two railroad companies which have each a through and separate line of communication between two given points, are held to be competing companies for all traffic between such points.

An arrangement by which two competing systems of railroads agree to divide their earnings for traffic between given points, for which they were previously competitors, is against public interest, contrary to public policy, and cannot be judicially enforced.

In disposing of such cases courts will not decree the nullity of the contract sought to be enforced. They simply abstain from dealing with it, or adjudicating any rights arising thereunder; or giving their aid for the division of results, although ascertained, between the parties thereto.

Railway Company et al. vs. Railway Company.

A PPEAL from the Civil District Court, Parish of Orleans.
*Rightor*, J.

*Howe & Prentiss* and *Thos. J. Semmes* for Plaintiffs and Appellants.

*Leovy & Blair* for Defendant and Appellee :

### I.

A railway "pool," or an agreement between two or more competing railroad companies to divide between them their earnings from competitive tariff, is illegal, being injurious to the public interests and contrary to public policy, and is, therefore, incapable of conferring upon the parties thereto any rights which a court of justice can recognize or enforce.

1. Whatever is injurious to the interests of the public is contrary to public policy, illegal and null; a combination which has a tendency to destroy competition, and thus to enhance the price of any commodity needed by the public, or of all commodities by increasing the cost of transportation, is injurious to the public interests; hence, a contract which creates such a combination is illegal and null. Hooker vs.. Vandewater, 4 Denio, 349 ; Stanton vs. Allen, 5 Denio, 435; Morris River Coal Co. vs. Barclay Coal Co., 68 Pa. St. 173; Arnot vs. Pittson and Elmira Coal Co., 68 N. Y. (Ct. App.) 558; India Bagging Co. vs. Cock, 14 Ann. 164 or 168 ; Craft vs. McConoughty, 79 Ill. 346 (22 Am. Reports 171); Salt Co. vs Guthrie, 35 Ohio St., 666; Morrill vs Railway Co., 55 N. H. 531.

2. *A fortiori* is this true when the combination is between a number of large and powerful *quasi*-public corporations, and absolutely destroys competition in the carrying trade of a vast extent of country, and completely deprives the public of the 'wholesome influence of competion upon rates and fares charged and accommodations and facilities afforded.

3. The recognized and well-established doctrine in this country is, that railway pools, as above defined, are illegal and unenforceable. 15 Fed. Reporter, 672.

### II.

The contract sued on is violative of the letter and spirit of Article X, Section 5, of the constitution of the State of Texas (1876); and, as it must be performed, if at all, mainly in the State of Texas and by Texas corporations, it is null and void, and was so *ab initio*.

1. The object of the constitutional provision was to secure for the people of Texas the benefits of competition between all railroad companies engaged in transportation in Texas, which were so situated as to be able to compete with each other.

2. Hence, the prohibition contained therein covers any kind of consolidation or operation of railroads in partnership which would destroy the competition that would otherwise exist between them. A consolidation of one system of connecting lines with a competing system of connecting line is, of course, as much prohibited as a consolidation of two single roads. Gulf, Colorado and Santa Fé Railroad Co. et al. vs. State of Texas, Supreme Court of Texas, Dec. 1888 (not yet reported).

3. A "contract which provides for dividing the earnings, after deducting a certain percentage for expenses, and which, therefore, makes it indifferent to the parties to the contract on which of the lines the passengers or freight are carried, *contains in itself the most essential element of consolidation and is, therefore, in violation of the law.*" Morrill vs. Railway Co., 55 N. H. 539.

4. Section 5, Article X of the Texas Constitution, also prohibits one railroad line from making any arrangement by which it may control "in any way" a competing line. An arrangement by which a right to demand a share in the earnings from all competitive business of a competing line is secured, certainly amounts to a very effective control over that line. G. C. & S. F. R. Co. et al. vs. State of Texas (supra).

5. A railroad company—outside of the limits of the rule against impairing the obligation of contracts—is subject to the Constitution, statutes and public policy of the State by which the corporation was created.

6. A law prohibiting rival and competing railroads within a State from consolidating or controlling each other is not a regulation of commerce between the States. It does not destroy, abridge, curtail, or interfere with the carriage of articles of interstate commerce.

7. The prohibitory clause in the Constitution of Texas is in the nature of a police regulation. In the exercise of the police power State legislation may indirectly affect interstate or foreign commerce, provided it imposes no burden thereon and does not conflict with any law of Congress on the same subject. Smith vs. Alabama, 124 U. S. 465; Kidd vs. Pearson, 128 U. S. p. 23.

8. The contract sued on relates to intra-state as well as to interstate commerce. If it is illegal as to the former, it is illegal entirely, for it is not separable into two independent parts.

9. In the following cases, State legislation similar in character to Article X, Sec. 5, of the Texas Constitution, and affecting interstate and foreign commerce to same extent, was sustained and enforced. Tippecanoe County vs. Lafayette, M. & M. R. Co., 50 Ind. 85 ; State vs. Vanderbilt, 37 Ohio St. 590 ; Penn. R. Co.'s App. (Pa.) 4 Cent. Rep. 495; State vs. Atchison & N. R. Co. (Neb.) 32 Am. & Eng. R, R. Cas. 388; Thouron vs. East Tenn. V. & G. R. R. Co., (Ch. Ct. Tenn.), 5 Ry. & Cpu. L. J. 77 ; Hartford & N. H. R. Co. vs. N. Y. & N. H. R. Co., 3 Robt. 411 ; Morgan vs. Donovan, 58 Ala. 241 ; Murray vs. Vanderbilt, 39 Barb. 140.

### III.

If the agreement sought to be enforced be found contrary to public policy or violative of the Constitution of Texas, and hence illegal and null, the court must declare the contract void and refuse to lend its aid in adjusting accounts between the parties to it. It must leave them where they are and dismiss the suit. *Ex turpi non oritur actio.*

1. The question of consideration is immaterial. A court will not recognize that an illegal contract can confer any rights, either to compel the payment of a consideration promised or the restitution of one received. *Potior est conditio defendentis.*

See authorities quoted under Division 1. Also Dillon vs. Allen, 46 Iowa, 299 (26 Amer. Reports, 145) ; Hall vs. Costello, 48 N. H. 176 (2 Amer. Reports, 207) ; Santa Clara Val. M. & L. Co. vs. Hayes (Cal.), 18 Pac. Reporter, 392 ; Sackson vs. McLean et al., 36 Fed. Rep. 213 ; R. S. C. C. 12, 1892, 1895, 1896; Cummings vs. Saux, 30 Ann. 207 ; Glasscock & Williams vs. Wells, 23 Ann. 517; 21 Ann. 110; 21 An. 304; H. D. p. 1010, No. 19 ; Id. p. 1009, Nos. 7 and 8; Id. p. 1008, No. 9.

2. To find the contract illegal and yet compel an accounting and settlement of transactions alleged to have been done during its continuance would be an anomaly in jurisprudence.

3. The doctrine laid down in Brooks vs. Martin, 2 Wall. 278, applies only to a case where plaintiff does not declare on the illegal contract and does require its aid to establish his demand, where he can show a title to the fund or property claimed without reference to the illegal contract, and where the court can grant the relief prayed for without touching the illegal contract. None of these essential attributes exist in this case. Cummings vs Saux, 30 Ann. 207; Jackson vs. McLean, 36 Fed. Rep. 213.

4. We do not rely merely on the *ultra vires* character of the contract. It is void, not simply for want of power to make it, but by reason of its intrinsic illegality. The distinction is that an *ultra vires* contract may sometimes be recognized and enforced, but an illegal contract, never.

5. In respect to contracts objectionable on grounds of public policy, corporations stand on precisely the same footing as individuals. Wood on Railway Tran., vol. I, pp. 491, ffg.

### IV.

If the pooling agreement ever had any valid existence, it was terminated by the Interstate Commerce Act. To enforce a performance of it after April 3, 1887, the date when that act went into effect, would be to compel the parties to commit what the supreme law of the land has declared to be an offence and a misdemeanor and positively prohibited under severe penalties. Interstate Commerce Act, Section 5.

1. The authorities are unanimous in stating that a statute may validly make unlawful that which was lawful before, when a contract was entered into, and that the effect of such a statute is to put an end to the contract. Bishop on Contracts (Ed. 1887), sections 594, 564, 480; Wald's Pollock on Contracts (Ed. 1885), pp, 356, 347; Presbyterian Church vs. City of New York, 5 Cow. 538; Brown vs. Delano et al., 12 Mass. 370; Hare on Contracts, p. 654; Am. and Eng. Encyl. of Law, *verbum* "Contract," p. 899.

2. If State legislation can thus put an end to a contract, *a fortiori* can an act of Congress do so.

---

The opinion of the Court was delivered by

POCHÉ, J.   Plaintiff's object is to enforce specific performance of one of the stipulations contained in a contract or agreement executed by the two corporations on the 26th of November, 1881, and modified or amended on the 18th of February, 1885.   The agreement was entered into, on the one part by several railroad companies operating in the States of Texas and Louisiana, then controlled, and therein represented by Collis P. Huntington of the city of New York; and on the other part by several similar corporations, also operating in Texas and in Louisiana, then under the control of Jay Gould of the city of New York, and who therein acted in behalf of said companies.

The expressed object of the contract was to adjust certain differences existing between the companies represented by Huntington and those represented by Gould, and to put at an end to existing litigation growing out of such differences and difficulties.

Hence the instrument signed by the parties, and the amendment thereto subsequently made, contained numerous stipulations intended to carry out the object proposed; and all have apparently been executed, save one, which is the subject matter of this controversy.   That feature of the contract is in the following words:

### VI.

"MUTUAL AGREEMENT TO "POOL" NEW ORLEANS AND GALVESTON TRAFFIC, AND NOT TO DISCRIMINATE AGAINST MISSISSIPPI TERMINI.

"It is further mutually agreed, that all unconsigned business, meaning all business whereof the route has not been designated in advance, destined for points West of El Paso, received by the said Texas and Pacific Railway Company, shall be turned over to the Galveston, Harris-

burg and San Antonio Railway Company at the Junction, or to the Southern Pacific Railroad Company at El Paso, as the case may be ; and all such ' unconsigned' business received by the Southern Pacific Companies and destined to places east of the ' Junction' reached by the Texas and Pacific Railway and its connections north of Shreveport, La., and west of the Mississippi River, shall be delivered to the Texas and Pacific Railway Company at the 'Junction,' or at El Paso, as the case may be. The gross earnings on all business passing over either of these roads between El Paso, or the Junction, and New Orleans, shall be divided equally ; and the gross earnings on all business passing over either of these roads between El Paso or the Junction, and Galveston, shall be divided on the basis of two-thirds thereof to the Gaveston, Harrisburg and San Antonio Railway Company and its connections, and one-third thereof to the Texas and Pacific Railway Company and its connections ; and the agents are to divide, as nearly as possible, such business between the two through lines, so that each shall do the proportion of business above allotted.

" In the event that either of the said companies of the one party, at either of the termini herein mentioned, shall be unable, or shall neglect or refuse, for any cause, to take the business and to perform the said service in the proportions above named, the company or companies of the other party shall be at liberty, so long as such disability continues, to take such business and perform said service, and shall be entitled to receive the compensation therefor.

" The Texas and Pacific Railway Company, the Missouri Pacific Railway Company, the Missouri, Kansas and Texas Railway Company, the St. Louis, Iron Mountain and Southern Railway Company, the International and Great Northern Railroad Company, and the Galveston, Houston and Henderson Railroad Company, shall severally take the through business any of them may have to do under this agreement, between El Paso and any point on the Mississippi River, without any discrimination as to rate, or otherwise, in favor of any line, road, or Transportation Company, and with equal dispatch'; and this provision applies to business destined to or coming from any railroad east of the Mississippi River.

" There shall be no discrimination as to local business by any of the roads of either of the parties as against those of the other party ; it being understood that the term 'through business,' as used in this agreement, applies to traffic carried to and from terminal, common or competitive points ; and any point upon the lines of the railways of the parties hereto that may be reached directly or indirectly by any railroad

competitive to either of said roads, is understood to be a competitive point."

The amendment of February, 1835, in so far as this section of the contract is effected, provides a different mode of dividing the earnings; it also extends the traffic covered by the agreement to all the business between New Orleans and El Paso on the one hand, and Galveston and El Paso on the other, whether the traffic originated at these points or not.

Among other stipulations, which have no bearing on the issues herein involved, the amendment contained the following modification:

"It is a part of the agreement of the parties hereto that in consideration of the premises, the said party of the second part and his associates, and the companies on whose behalf he executed the said agreement of November 26th, 1881, release the said party of the first part and his associates, and the companies on whose behalf he executed such agreement, from all claims down to November 1st, 1884, arising under Article VI of said agreement."

Plaintiff's demand is based exclusively on the section herein above transcribed, and embraces three separate claims growing therefrom. Its object is to recover the excess of earnings realized by the defendant company from the first of November, 1884, to March 31, 1887, alleged to amount, as shown by defendant's reports made from month to month during that space of time, to the sum of $350,717 78; a similar excess alleged to amount to $200,000, from March 31, 1887, to January, 1888; during which time the defendant made no report, the defendant having ceased and refused to further report or account after March, 1887; and it urges an additional claim of $5859 49 for an excess of earnings in its favor in the operation of certain lines of railroads in New Mexico and Arizona, thus footing up the claims at the aggregate sum of $556,577 27. And plaintiff's demand finally covers such additional claims growing out of the contract in suit, as may be discovered and ascertained on trial.

For defence the following exceptions were pleaded:

1st. That the contract sued upon, being a railway pool, between competing railroad companies to divide between them their earnings from competition traffic, is illegal for the reason that it is injurious to public interests and contrary to public policy; and hence it cannot be enforced by a court of justice.

2d. That the contract was forbidden by the provisions of the constitution of the State of Texas, in force at the time that it was entered into.

3d. That if ever valid, the contract was terminated by the provisions of an act of the Congress of the United States, approved February 4,

1887, entitled " An act to regulate commerce," which went into effect on the 3rd of April, 1887, and is generally known as the " Interstate Commerce Act."

The judgment below was in favor of defendant and plaintiff appeals.

A point, which overshadows the discussion of all three of the exceptions, is made by plaintiff's counsel, who contend that the agreement between the parties having been sanctioned by a decree of the courts in which the litigation adjusted between the railroad companies, was pending, it has now acquired the force and effect of the thing adjudged, and hence it cannot be attacked collaterally.

As a general proposition of law the contention is unquestionably correct. Civil Code, Art. 3078; Adle vs. Prudhomme, 16 Ann. 343; Raburn vs. Pierson, 23 Ann. 696; Oglesby vs. Attrill, 105 U. S. Reports. But from the very nature of the principle, as shown by the authorities cited, it appears clearly that those matters only which were covered by, and included in, the compromise or agreement, are affected as things adjudged, as a result of the adjustment, even when the same is subsequently sanctioned or confirmed by the judgment of a competent court.

The rule invoked applies to matters of pre-existing differences which are settled and compromised, and not to agreements or covenants for future action and execution.

Undoubtedly the attempt of either party to the "Gould-Huntington" agreement to avoid collaterally the effect of the adjustment of any contentious matter, or of any litigious rights involved in litigation hitherto pending and which had been in terms settled by the compromise, would have been defeated by the simple application of the principle now under consideration. But the subject-matter of Article 6 of the agreement which is now in suit was not a subject of contention between the parties, either as a difference or in the shape of any pending litigation, at the time that the agreement was entered into. In fact it had no existence before, and was only brought into being or life by the contract of November 26, 1881, and it had no reference to the past, but its whole operation or effect was intended exclusively for the future.

This was manifestly the understanding of all the parties at the time; it shaped the action of their counsel who thereafter invoked judicial confirmation of the adjustment; and it was the sole guide of the court when it rendered the decree now set up as *res adjudicata*, touching all matters and stipulations contained in the "Gould-Huntington" agreement.

In formulating its decree, the court was careful to enumerate in detail all the litigious matters which were in suit between the several railroad

companies, which had participated in the adjustment and which were parties to litigation then pending before the court; and it requires no argument to show that no other matters or stipulations in the agreement were in any way or degree affected by the judgment then rendered. To clear away any doubt which might thereafter exist or be suggested as to the precise meaning, bearing, intent and effect of the judgment rendered, the court made the following explanation of its own decree, as part of said decree:

"The aforesaid decree is made to carry out the provisions *in this behalf* of said agreement, dated November 26, 1881, which is hereby made a part of this decree, and by consent of the parties, and upon consideration by the court, is hereby ordered and decreed to be binding upon each and all of the parties hereto in all its stipulations and agreements, as *therein shown*, and said decree does not *otherwise affect or interfere with the provisions of said agreement*." (Italics are ours.) Hence we conclude and we hold that the stipulations of Article 6 of the "Gould-Huntington agreement" have not the force and effect of the thing adjudged, and that they are lawfully liable to attack in the mode and manner herein adopted by the defendent corporation. This conclusion is of course mainly predicated on the theory fairly deducible from the record itself, that the agreement in its entirety does not evidence a single and connected contract, depending on all its parts and stipulations for a proper execution as an effect flowing from the unity of the contract; but that the instrument in its shape was used as a means to facilitate the execution by two representatives of numerous obligors and distinct obligees of a series of varied and distinct contracts. As controlling and representing the varied interests of a cluster of railroad companies, Huntington acted in behalf of the following corporations: "the Southern Pacific Railroad Company of California, the Southern Pacific Railroad Company of New Mexico and the Southern Pacific Railroad Company of Arizona, the Galveston, Harrisburg and San Antonio Railway Company, the Texas and New Orleans Railroad Company and the Louisiana Western Railroad Company." And Gould, clothed with corresponding authority from his system of roads, stipulated in behalf and in the name of the following companies: "The Texas and Pacific Railway Company, the International and Great Northern Railroad Company, the Missouri Pacific Railway Company, the Missouri, Kansas and Texas Railway Company, and the St. Louis Iron Mountain and Southern Railroad Company."

In this connection, the record shows to our entire satisfaction that the parties themselves did not understand that the instrument was intended

to evidence a single connected contract, as appears from the following stipulation:

"The foregoing agreement shall be submitted by the respective parties thereto to the several Boards of Directors which they respectively represent, and the same shall be accepted, adopted, ratified, confirmed, made and declared by said several Boards of Directors to be the act and contract of their respective corporations, so far as the same affects them respectively;"

And the same understanding appears in yet bolder relief from the language used in the following clause:

"It is understood that either or any of the said several railroad companies, parties to this agreement, may maintain any action, either at law or in equity, against either, any or all of the other companies, parties to this agreement, to protect any right secured by this agreement, to specifically enforce the same, or to recover damages for the breach of any stipulation in this agreement affecting its interests, and that no objection shall be had or taken to any such action by reason of the nonjoinder of parties as plaintiffs; and all clauses in this agreement contained are to be so construed as to secure this right." The parties have thus construed their own contract, and have themselves qualified their agreement in a manner which completely refutes the argument of plaintiff's counsel in the present case.

It is true that by the act of incorporation, in 1884, which created the defendant company in its present autonomy, all the corporations which were then represented by Huntington, with the exception of the Southern Pacific Railroad Companies of California, of Arizona, and of New Mexico, have all been fused into, and were made parts of, the same system known as the "Southern Pacific Company." But this does not alter the nature and legal effect of the original contract as executed and understood by the original parties to the agreement.

That it was so understood is made manifest by a clause inserted in the amendment of the agreement under date of February 18, 1885, which stipulates, as was done in the original contract, that the modifications then made were to be submitted for adoption and ratification, to the respective boards of directors of the companies represented respectively by Huntington and by Gould.

We feel, therefore, fully warranted to treat and discuss article 6, now in suit as a complete and independent contract, with a sole consideration, which was the mutual advantage to be derived therefrom by the companies to be affected thereby. The clause or contract as shaped, has reference to no other portion of the agreement, which is complete for

the purposes originally contemplated without the contract contained in that clause, as complete as the contract formulated in the section stands without any reference to any or all of the other portions of the agreement. In discussing that article we have therefore no concern with any of the concessions made mutually by the parties to the agreement, as considerations for other matters specified, or other advantages yielded, or obtained, by the parties respectively in other portions of the agreement.

We shall now discuss the real nature and the legal effect of the contract evidenced by Article 6 of the "Gould-Huntington" agreement.

It appears from the record, including evidence taken on the trial of the exceptions, that the systems of railroad companies made parties respectively to the proposed arrangement, had each a through and complete line of communication, absolutely independent of each other, except as hereafter stated, from El Paso to Galveston, and from El Paso to New Orleans, the points of traffic for which the earnings of the contracting parties were to be divided. From El Paso to New Orleans the Texas and Pacific, plaintiff herein, had a continuous line of communication of itself, and from El Paso to Galveston, its means of communication were by its own line from El Paso to Minola, and thence by the International and Great Northern Railroad Company, connecting with the Galveston, Houston and Henderson Railway Company, two of the companies controlled and represented by Jay Gould.

The communication of the Southern Pacific, defendant herein, between El Paso and Galveston was by means of the Galveston, Harrisburg and San Antonio Railway Company and the Galveston, Houston and Henderson Railway Company, and its means of communication between El Paso and New Orleans were through the lines of the Galveston, Harrisburg and San Antonio, the Texas and New Orleans, the Louisiana Western and the Morgan's Louisiana and Texas Railway Companies, all then controlled by Huntington and now parts of the Southern Pacific system. The only parcels or portions of the through lines between either of the three points of traffic, used in common by the two systems, are a line of ninety miles east of El Paso and a short line between Galveston and Houston, and the rights of the parties to the use of these two lines were secured in the agreement of November, 1881, in two separate and distinct stipulations outside, and entirely and safely independent of Article 6, now under discussion. There is no contention here as to the free exercise of that right.

Now, as at certain points, both in Texas and in Louisiana, it appears that the respective lines of the plaintiff's and of the defendant's systems

of roads are very far apart, there is no pretention that they are parallel roads, but from the record as shown by the foregoing statement, it appears very clearly that for the traffic between El Paso and New Orleans and between El Paso and Galveston, they were unquestionably competing lines.

It cannot be doubted that shippers who desired, without the existence of the agreement contained in Article 6, to consign goods either from El Paso to New Orleans, or the reverse, or from Galveston to El Paso, or the reverse, had the option to select either of the two lines in accordance with the most favorable terms which he could obtain from either. He would then have had the advantage of the natural competition existing between the two rival systems. But under the effect of the arrangement now under discussion, the shipper could desire no advantage as a result of his choice between the two, as the terms would be the same with either or both.

It is, therefore, too clear for further argument or illustration that the first, the lasting and the inevitable result of the agreement to the public was to stifle competition, and as competition is the life of trade, the effect of the contract must necessarily and inevitably have been injurious to public interests, and hence it was contrary to public policy.

We have been at great pains, and have devoted long and tedious labor to examine all the authorities, consisting mainly of opinions rendered on this point by courts of last resort in this country, which were submitted to us by counsel in this case, and we reach the conclusion that American jurisprudence has firmly settled the doctrine that all contracts which have a palpable tendency to stifle competition, either in the market value of commodities or in the carriage or transportation of such commodities, are contrary to public policy, and are, therefore, incapable of conferring upon the parties thereto any rights which a court of justice can recognize or enforce. A reference to some of the leading and most pointed authorities on the subject may not be out-place in this opinion, nothwithstanding its already formidable length.

In the case of Hooker vs. Vandewater, 4 Denio, p. 349, the court had to consider a contract between the proprietors of several lines of canal boats, who had agreed to establish fixed rates of freight and passage for a certain season and to divide the net earnings among themselves according to fixed rules. The attempt of one of the contracting parties to enforce the agreement against a recalcitrant member of the combination was discountenanced. True, the contract fell under the ban of a special statute of the State; but the court, nevertheless, took occasion to sanc-

tion the general principle which underlies our conclusions in this case. The court said:

"It is a general proposition that an agreement to do an unlawful act cannot be supported at law—that no right of action can spring out of an illegal contract; and this rule applies not only when the contract is expressly illegal, but whenever it is opposed to public policy, or founded on an immoral consideration—the maxim being *exturpi causa non oritur actio.*"

In the case of Stanton vs. Allen, 5 Denio, p. 434, the court refused its aid to enforce the payment of a promissory note growing out of transactions predicated on a similar contract, on the ground that such a contract cannot receive judicial sanction. We cull the following language from that opinion: "Though the branch of the law relating to public policy is liable to be misunderstood and extended beyond its proper dimensions, still it must not on that account be neglected or disparaged. The rule that contracts and agreements are void when contrary to public policy, when properly understood and applied, is one of the great preservative principles of a State."

And referring to the case herein previously quoted, the court said: "That decision being conclusive on the main point in the present case, I might have rested upon that authority alone, if I had not supposed that the occasion called for an opinion as to the legality of such an association upon the principles of the common law."

In Ohio an association of salt manufacturers entered into a combination for the purpose of selling and transporting that commodity. The court refused its aid to enforce its conditions, saying among other things:

"The clear tendency of such an agreement is to establish a monopoly, and to destroy competition in trade, and for that reason, on grounds of public policy, courts will not aid in its enforcement. It is no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public." Salt Company vs. Guthrie, 35 Ohio, 666.

The doctrine finds additional support and sanction from the following authorities:

Gibbs vs. Baltimore, 130 U. S., p. 408, in which the court took occasion to set down a rule peculiarly applicable to pooling arrangements between competing railroad companies, which are universally recognized and treated in jurisprudence as *quasi* public corporations. The

learned Chief Justice, as the organ of the court, said with great clearness and terseness:

"Hence, while it is justly urged that those rules which say that a given contract is against public policy should not be arbitrarily extended so as to interfere with the freedom of contract * * *, yet in the instance of business of such character that it presumably cannot be restrained to any extent whatever without prejudice to the public interest, courts decline to enforce or sustain contracts imposing such restraint, however partial, because in contravention of public policy."

See also: Woodstock Co. vs. Extension Co., 129 U. S., 644; Morris vs. Barclay, 68 Pa. State, 173; Arnot et al. vs. Canal Co., 68 N. Y., 558; Craft vs. McConoughty, 79 Ill., 346 (22 Am. Reports, 71); Morrill vs. R. R. Co., 55 N. H., 537; Jackson vs. McLean, 36 Federal Reporter, 213; Santa Clara vs. Hayes et al., 18 Pacific Reporter, 392; Hamilton's note, 15 Federal Reporter, p. 667.

We are referred by plaintiff's counsel to several authorities which are quoted as antagonizing the views which we have adopted in this opinion. But we have not found any decisions emanating from American courts of last resort which have enforced or recognized any rights flowing from a contract which had a tendency to stifle competition in trade, or in the business of common carriers, or which were for other or similar reasons contrary to public policy. The adjudications which have sustained contracts assailed on similar grounds are predicated on facts which removed each particular case from the operation of the rule, for the simple reason that "cases must be judged according to their circumstances, and can only be rightly judged when the reason and grounds of the rule are carefully considered." 20 Wal., 64, 68.

Under our own system, the doctrine is not only sanctioned by judicial authority, but it has been specially incorporated in our code, in its wide range of remedies for wrongs and enforcement of rights.

Article 1893 reads: "An obligation without a cause, or with a false or unlawful cause, can have no effect."

Article 1895 provides: "The cause is unlawful when it is forbidden by law, when it is *contra bonos mores* (contrary to moral conduct) or to public order."

In the case of Firemen's Association vs. Berghans, 13 Ann., 209, the principle was formulated thus: "When a contract belongs to a class which is reprobated by public policy, it will be declared void, although in that particular instance no injury to the public may have resulted."

The case of the India Bagging Co. vs. Kock, 14 Ann., 168, involved an attempt to judicially enforce one of the conditions of an association

formed by dealers in bagging, who had agreed not to sell any bagging for the term of three months, without the consent of the majority of the members, under a stipulated penalty. In dismissing the action, the court used the following language:

"This is a case which ought never to have come before us. The agreement between the parties was palpably and unequivocally a combination in restraint of trade, and to enhance the price in the market of an article of prime necessity to cotton planters. Such combinations are contrary to public order, and cannot be enforced in courts of justice."

See also: Glasscock vs. Wells, 23 Ann. 517; Cummings vs. Saux, 30 Ann. 207.

Our ruling on this point is fortified in a double panoply, furnished by civil as well as common law authorities.

Plaintiff's counsel, however, make the point that were they to concede, for the sake of argument that the contract sued on might be against public policy, yet in so far as it has been executed, plaintiffs are entitled to recover.

The argument is predicated mainly on the fact that from month to month, between November, 1884, and March, 1887, the defendant had executed its obligation under the contract by submitting reports of its earnings, by which it appeared that it was indebted to plaintiff in the sum of $350,717 78, and that by pleading a peremptory exception, the defendant admitted an additional indebtedness on the same basis, of $200,000.

A proper understanding of the considerations which underlie our conclusions herein previously announced affords a ready answer to this contention.

The rule is that no effect can be given to a contract reprobated by law, or contrary to public policy—and hence courts cannot lend their aid even to secure an otherwise fair division of the results of an illegal contract between the parties thereto.

In cases like the present, in refusing to enforce the stipulations of a contract which has the palpable tendency to stifle competition, or to create or foster a monopoly, courts will not go to the extent of decreeing the nullity of the contract sued on, but they simply abstain from dealing with it, or from discussing any of its effects as between the parties. On ascertaining that the building is infested with the disease of illegality, the judge simply refuses to enter its portals, and he retires without incurring contact with any of its inmates, and without attempting to examine into, or to rectify, any rights or wrongs which may exist between the inmates of the polluted household. He leaves them quietly

where they have placed themselves, and he turns a deaf ear to any equities which one of the parties may invoke against the other.

It is on this principle that by far the greater number of the decisions here in above quoted were grounded.

In the case of Gibbs vs. Baltimore Gas Co., 130th U. S., p. 396, the court refused its aid to a party who claimed a stipulated commission for having negotiated a favorable contract for the gas company, on the ground that the contract was illegal.

The court expounded the general principle as follows : " The rule of law is of universal operation, that none shall, by the aid of a court of justice, obtain the fruits of an unlawful contract."

There is no conflict between the law of that case, and the legal conclusions announced in the case of Brooks vs. Martin, 2 Wallace, p. 70, on which plaintiff's counsel mainly ground their hopes of success on this point.

Brooks and Martin had formed a partnership for speculation in soldiers land warrants, which had been forbidden by an Act of Congress. Brooks who had the exclusive management of the firm's business, acting as the agent of his co-partner, subsequently bought out the latter's interest in the concern.  To a suit brought by Martin to avoid the sale on the ground of fraud on the part of Brooks, the illegality of the original dealings of the firm was pleaded.  But the court held that the illegality of the original contract was not a bar to Martin's recovery, as his claim did not involve the nature of said contract.  The following clear distinction between a cause of action on the original contract, and that on the rescission of a sale tainted with fraud, is a fair answer to plaintiff's reliance on that case.

"We have no doubt that the traffic was illegal.  Undoubtedly the main object of the act of February 11, 1847, was to protect the soldier against improvident contracts of the precise character of those developed in this record.  *  *  *  If a soldier who had thus sold his claim to Brooks, Field & Co. had refused to perform his contract, or to do any act which was necessary to give them the full benefit of their purchase, no court would have compelled him to do it, or given them any relief against him.  And if they had, by any such means, got possession of the land warrant or scrip of a soldier, no court would have refused, in a proper suit, to compel them to deliver up such land warrant or scrip to the soldier.  Or if Brooks, after signing these articles of partnership had said to Martin, " I refuse to proceed with this partnership, because the purpose of it is illegal," Martin would have been entirely without remedy.  If, on the other hand, he had said to Martin, " I have bought

one hundred soldiers' claims, for which I have agreed to pay a certain sum, which I require you to advance according to your agreement." Martin might have refused to comply with such a demand, and no court would have given either of his partners any remedy for such refusal."

This is precisely the legal attitude occupied by the parties in this controversy.

In an illegal contract, the defendant herein had agreed and covenanted to pay over to plaintiff any pool balance to which the latter was entitled under the arrangement to divide their joint earnings in the traffic between El Paso and Galveston, and that between New Orleans and El Paso. It has acknowledged the existence of such a balance; but when called on to deliver the same, it refuses, and sets up the illigality of the contract under which it was obtained. The answer of the court must be that plaintiff, urging a claim based exclusively on an illegal contract, is without remedy.

Having concluded that the contract sued on was illegal as contrary to public policy, we see no necessity to discuss the two other grounds of exception set up by the defendant.

Judgment affirmed.