UNITED STATES v. TRANS-MISSOURI FREIGHT ASS'N et al.

(Circuit Court, D. Kansas. November 28, 1892.)

No. 6,799.

1. CARRIERS—COMBINATIONS TO MAINTAIN RATES.

An agreement between several competing railway companies, and the formation of an association thereunder, for the purpose of maintaining just and reasonable rates, preventing unjust discriminations by furnishing adequate and equal facilities for the interchange of traffic between the several lines, without preventing or illegally limiting competition, is not an agreement, combination, or conspiracy in restraint of trade in violation of the act of July 2, 1890, § 1.

2. SAME—MONOPOLIES.

Nor is such an agreement in violation of section 2 of such act, as tending to the monopolization of trade and commerce.

3. SAME—PUBLIC POLICY—TRANSFER OF FRANCHISE.

Where each company, by such agreement, maintains its own organization as before, elects its own officers, delegates no powers to the association to govern in any respect the operations or methods of transacting the routine

business of the several competing lines, but simply requires that each company shall charge just and reasonable rates, and provides for certain regulations in regard to changes in such rates, such contract or agreement is not forbidden by public policy as amounting to a transfer of the franchises and corporate powers of such companies.

4. SAME—MONOPOLIES—INTERSTATE COMMERCE ACT.
    It was not the intention of congress to include common carriers subject to the act of February 4, 1887, within the provisions of the act of July 2, 1890, which is a special statute, relating to combinations in the form of trusts and conspiracies in restraint of trade.

In Equity. Bill by the United States against the Trans-Missouri Freight Association, the Atchison, Topeka & Santa Fe Railroad Company, and others, for the dissolution of an association or combination alleged to be in restraint of trade in violation of the act of July 2, 1890, and for an injunction restraining the several companies from carrying into effect the agreement under which the association was formed. Bill dismissed.

J. W. Ady and S. R. Peters, for complainant.
George R. Peck, B. P. Waggener, Wolcott & Vaile, Wallace Pratt, J. P. Dana, Spencer, Burnes & Mosman, J. D. Strong, W. F. Guthrie, J. M. Thurston, A. L. Williams, N. H. Loomis, R. W. Blair, John R. Hawley, W. F. Evans, M. A. Low, James Hagerman, and T. N. Sedgwick, for defendants.


RINER, District Judge. This is a bill in equity, brought by the United States attorney for the district of Kansas, by direction of the attorney general, in the name of the United States against the Trans-Missouri Freight Association and 18 railway companies, which, it is alleged in the bill, constitute the association.

The object and purpose of the bill is to obtain a decree declaring said freight association dissolved, and enjoining defendants, and each of them, from carrying out the terms of a certain memorandum of agreement entered into by and between the 18 railway companies forming this association, which agreement, it is alleged, is unlawful, because maintained by said railway companies in violation of an act of congress, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890.

It is alleged in the bill that the defendants (the 18 railway companies) are common carriers incorporated under public statutes of several states and of the United States, and are engaged in moving, carrying, and transporting freight and commodities in the commerce, trade, and traffic which is continuously carried on among and between the several states of the United States, and among and between the several states and territories of the United States, and between the states and territories of the United States and foreign countries; and that prior to March 15, 1889, each of the defendant railway companies owned, operated, and controlled separate lines of railroad, and furnished to persons engaged in trade and others, among the states and territories of the United States, separate, distinct, and competing lines of transportation between the states and territories of the United States lying west of the Mis-

souri river and east of the Pacific ocean, and that to encourage and secure the benefit of the competing lines of transportation throughout that region of country the government of the United States and the states and territories within the region just mentioned had granted to the defendants public franchises, land grants, securities, and subsidies of great value. That on the 15th day of March, 1889, the defendant railway companies, not being content with the rates of freight they could receive with free competition among themselves, but contriving and intending unjustly and oppressively to establish and maintain arbitrary rates of freight and transportation in the interstate commerce throughout said region, did combine, conspire, confederate, and unlawfully agree together, and did enter into a written agreement and contract, known as the "Memorandum of Agreement of the Trans-Missouri Freight Association," by the terms of which said agreement the association has control of all competitive traffic between points in that region of country lying west of a line commencing at the ninety-fifth meridian, on the Gulf of Mexico, and running north to the Red river, and thence to the eastern boundary of the Indian Territory; thence along the eastern line of said territory and of the state of Kansas to Kansas City, Mo.; thence, by the Missouri river, to the point of intersection of that river with the eastern boundary line of Montana; thence by said eastern boundary line to the international line between this country and the British possessions. That the said association, by a board created by each company appointing one person to represent it in the association, and that the several railway companies, members of the association, gave to the association the power to establish and maintain rules, regulations, and rates on all competitive traffic, through and local, within the region of country described in the agreement; and that said association, by the terms of the agreement, is given the power to punish by fine any member that reduces the rate fixed by the association.

It is further alleged in the bill that the said agreement took effect on the 1st day of April, 1889, and that ever since that time the said railway companies, by reason of said agreement and combination, and under duress of the fines and penalties prescribed in the articles of agreement, have put in force and maintained, and now maintain, tariffs and rates of freight fixed by said association; and that the officers and agents of said railway companies have, ever since said agreement took effect, refused to put in force reasonable rates of freight, based upon the cost of construction and operation of their several lines of railroad and other proper elements to be considered in the making of freight rates; and that the people engaged in trade and commerce within the region of country mentioned in said articles of agreement are, by reason of said combination and association, deprived of rates of freight, benefits, and facilities which might reasonably be expected to flow from free competition between said several lines of transportation. It is further alleged in the bill that, notwithstanding said association is in violation of the act of congress of July 2, 1890, said defendants, since the date of said act, have, and still continue to maintain, the arbitrary rates of freight fixed by the

said Trans-Missouri Freight Association, to the great injury and prejudice of the public and to the people of the United States. Then follows the prayer that the defendants, and each of them, be enjoined from further agreeing, combining, conspiring, and acting together to maintain rules and regulations for carrying freight upon their several lines of railroad, to hinder trade and commerce between the states and territories of the United States; and that they be enjoined from continuing in a combination, association, or conspiracy to deprive the people engaged in trade and commerce among the states and territories of the United States of such facilities, rates, and charges of freight and transportation as will be attained by free and unrestrained competition between said several lines of railroad; and that said defendants be enjoined from agreeing, combining, conspiring, and acting together to monopolize or attempting to monopolize freight traffic in the states and territories of the United States and that all and each of them be enjoined from agreeing, combining, conspiring, and acting together to prevent each or any of their associates in said agreement from carrying freight and commodities in the trade and commerce between the states and territories of the United States, except at such rates as shall be voluntarily fixed by the officers and agents of each of said roads acting independently and separately in its own behalf.

The defendants the Missouri, Kansas & Texas Railway Company, the Chicago, Kansas & Nebraska Railway Company, and the Denver, Texas & Ft. Worth Railroad Company have filed answers, denying that they were members of the Trans-Missouri Freight Association. The other 15 companies have each filed a separate answer, but, as they are substantially the same as to the facts, it will not be necessary to refer to them separately. They each admit that they are common carriers engaged in transporting persons and property among the several states and territories of the United States, and allege that, as such common carriers, they are subject to the provisions of the act of congress approved February 4, 1887, entitled "An act to regulate commerce," with the various amendments thereof and additions thereto, and that said act and the amendments constitute the system of regulation which has been established by congress for the common carriers subject to said act; and they deny that they are subject to the provisions of the act of congress entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890. Further answering, the defendants admit that they severally own, control, and operate separate and distinct lines of railroad fitted up for carrying on business as common carriers of freight, independently and disconnectedly with each other, except that common interest exists between certain of the companies named in the answer. It is further admitted by the defendants that the lines of road mentioned in the bill are lines of transportation and communication engaged in freight traffic between and among the states and territories of the United States, and are through lines for freight traffic in that region of country lying west of the Mississippi and Missouri rivers and east of the Pacific ocean, but deny that they are the only such lines, and

allege that there are several others, naming them. It is further admitted that prior to the organization of the freight association the defendants furnished to the public, and persons engaged in trade, traffic, and commerce between the several states and territories of the United States and countries named in the bill, separate, distinct, and competitive lines of transportation and communication, and allege that they still continue to do so. It is further admitted that some of the roads mentioned in the bill received aid by land grants from the United States, and others received aid from the states and territories by loans of credits, donations of depot sites and right of way, and in a few cases by investments of money, and the people of the said states and territories to a. limited extent made investments in the stocks and bonds in some of said railroads, while other of the lines mentioned in the bill were almost entirely constructed by capital furnished by nonresidents of said region. It is further admitted that the purpose of said land grants, loans, donations, and investments was to obtain the construction of competitive lines of transportation and communication, to the end that the public, and people engaged in trade and commerce throughout said region of country, might have the facilities afforded by railways in communicating with each other, and with other portions of the United States, and with the world, and denied that they were granted for any other purpose. Defendants further admit the formation, on or about March 15, 1889, of the voluntary association described in the bill as the Trans-Missouri Freight Association.

Further answering, defendants deny that they were not content with rates prevailing at the date of agreement; they deny any intent to unjustly increase rates, and deny that said agreement destroyed, prevented, or illegally limited or influenced competition; they deny that arbitrary rates have been fixed or charged; they deny that rates have been increased, or that the effect of free competition has been counteracted; they deny any purpose in the formation of said association to monopolize the freight traffic or commerce between the states and territories within the region mentioned in the bill, and deny that the said agreement is in any respect the unlawful result of any confederation or conspiracy. Further answering, defendants allege that they are subject to the provisions of the act of congress approved February 4, 1887, entitled "An act to regulate commerce," in the matter of adjusting rates on their several roads, so as to prevent unjust discrimination against persons and localities, which involves an adjustment between different companies interested in joint rates, and doing business in said region of country, requiring preconcerted action between defendant companies, and that this service is the greater part of the work of the association. The defendants admit that the chairman of the association is authorized to investigate rate cutting, and that the articles of agreement provide. that he may assess fines for violations thereof, but allege that no attempt has been made to enforce the collection of fines since 1890. Further answering, the defendants allege that the principal object of the association is to establish reasonable rates, rules, and regulations on all freight traffic, and the maintenance of

such rates until changed in the manner provided by law. It is further alleged that the agreement was filed with the interstate commerce commission, as required by section 6 of the act of February 4, 1887. Defendants further allege that it is not the purpose of the association to prevent members from reducing rates or changing the rules or regulations fixed by the association, and that by the terms of the agreement each member may do so; the preliminary requirement being that the proposed change shall be voted upon at the meeting of the association, after which, if the proposal is not agreed to, the line making the proposal can make such reduced rate notwithstanding the objection of the other lines. That the purpose of this provision is to afford opportunity for the consideration of the reasonableness of any proposed rate, rule, or regulation by all lines interested, and an interchange of views on the effect of such reduction; and that reductions of rates have been made in many instances, through said process, by said association. It is admitted by the answer that this agreement took effect April 1, 1889, and that it has since remained operative, and that the rates, rules, and regulations properly fixed and established from time to time, under said agreement, have been put into effect and maintained in conformity to law; but it is denied that by reason of said agreement, or under duress of fines and penalties or otherwise, the defendants have refused to establish and maintain just and reasonable rates, and it is alleged that the object of the association at all times has been and is to establish all rates, rules, and regulations upon a just and reasonable basis, and to avoid unjust discrimination and undue preference.

The answer further denies that shippers or the public are in any way oppressed or injured by reason of the rates fixed by the association. but, on the contrary, it is alleged that the agreement, and the association established under it, have been beneficial to the patrons of the defendant railway lines, composing the association, and the public at large.

A copy of the agreement is set out at length, and attached to the answer of the Atchison, Topeka & Santa Fe Railway Company.[1] The case was set down for hearing on bill and answer, and the pleadings only are to be considered. The answer, therefore, is admitted to be true in all its allegations of fact, even when not stated positively; and the defendants only aver that they believe, and hope to be able to prove, such facts, but the complainant does not thereby admit conclusions of law, nor matters concerning which the court takes judicial notice.

The act of congress of July 2, 1890, which it is alleged in the bill is violated by the agreement to form and the formation of the freight association, in the first section declares every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, to be illegal, and provides for the punishment by fine or imprisonment of every person who shall make any such contract, or engage in any such combination or conspiracy. Section 2 declares that every person who shall monopolize

[1]See note at end of case.

or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states or with foreign nations shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine or imprisonment. Section 3 makes the provisions of the first section applicable within the territories, and between one territory and another, and between a territory and a state, and between the District of Columbia and a territory or state. Section 4 confers jurisdiction upon the several circuit courts of the United States to prevent and restrain violations of the act, and makes it the duty of the district attorneys in the respective districts, under the direction of the attorney general, to institute proceedings in equity to prevent and restrain such violation. Section 5 provides for bringing in other necessary parties. Section 6 provides for the seizure and condemnation of property owned under any contract or combination prohibited by the act, and being in the course of transportation from one state to another or to a foreign country. Section 7 gives a right of action to any person injured by violations of the act, and authorizes a recovery of threefold damages. The eighth and last section provides that the word "person" or "persons," whenever used in the act, shall be construed to include corporations or associations existing under or authorized by the laws either of the United States or of the territories or of any state or of any foreign country.

It will be seen from an examination of this statute that its purpose was to reach two evils: First, contracts, combinations, or conspiracies in restraint of trade; and, second, monopolies. It was urged at the argument that the contract mentioned in the bill, and the association formed thereunder, came within the provisions of this act of July 2, 1890, for the reason that it is a contract or agreement in restraint of trade, in that it prevented free competition in the matter of transportation of freight among the several states within the region specified in the bill; counsel for the government insisting that "trade and commerce among the several states of the Union is free, except as regulated and restrained by acts of congress, and that no state, municipality, corporation, individual, or combination of individuals can by any act or device legally restrain, hinder, and retard it." On the other hand, it is insisted by the defendants that there is no fixed rule of law by which to determine whether any given contract is in restraint of trade, but that in determining the question the courts must look to the particular circumstances of each case.

In disposing of this branch of the case, I will first briefly refer to some of the decided cases cited by counsel in their briefs.

The case of Com. v. Carlisle, Brightly, N. P. 36, was a case where certain master shoemakers had entered into an agreement not to employ any journeymen shoemakers who would not consent to work at reduced wages; the purpose being to re-establish wages for this class of labor which had prevailed before that time, but which the defendants had been compelled to advance by reason of a combination among the workmen. The court, in deciding the case, said:

"Where an act is lawful for an individual it can be the subject of conspiracy when done in concert only where there is a direct intention that in-

jury shall result from it, or where the object is to benefit the conspirators to the prejudice of the public or the oppression of individuals, and where such prejudice or oppression is the natural and necessary consequence flowing from the act."

The case of People v. Fisher, 14 Wend. 9, was an indictment against journeyman shoemakers for conspiring together to fix the price of making boots, and establishing a penalty against any journeyman shoemakers who should make boots for a less rate than that fixed by the parties to the agreement, and also agreeing to refuse to work for any master shoemaker who should hire a man who reduced the rates for making boots; and it was held in that case that this was a conspiracy against trade and commerce, and, as such, prohibited under a statute providing: "If one or more persons shall conspire to commit any act injurious to trade or commerce, they shall be guilty of a misdemeanor." In passing upon the case, Savage, C. J., said:

"The man who owns an article of trade or commerce is not obliged to sell it for any particular price, nor is the mechanic obliged by law to labor for any particular price. He may say that he will not make coarse boots for less than $1.00 per pair, but he has no right to say that no other mechanic shall make them for less. If one individual does not possess such a right over the conduct of another, no number of individuals can possess such a right. All combinations, therefore, to effect such an object, are injurious, not only to the individual particularly oppressed, but to the public at large."

Hooker v. Vandewater, 4 Denio, 349, was an action to compel a division of net earnings between several lines of boats engaged in transporting persons and freight on the Erie and Oswego canals. The agreement was that each party should run his line of boats upon these canals during the period of canal navigation in 1842, at rates of freight fixed by themselves, from which neither should deviate; and to indicate the interest of each the respective lines were converted into stock, amounting in all to 69 shares. All were to share equally in the net earnings of all the lines in proportion to the number of shares of such stock, and to enforce performance of the contract a common agent was appointed, to whom each party to the agreement was to advance and keep good $35 on each share of such stock, and who was from time to time to receive returns of the business done by each line, and adjust the proportions from the earnings due to each, and out of this common fund to pay and liquidate all such sums as should appear from time to time to be due from one to the other. It was held in this case that the transaction amounted to a conspiracy to commit an act injurious to trade, and was therefore illegal and void.

The case of Stanton v. Allen, 5 Denio, 434, was a suit upon a promissory note, given, as stated upon the face of the note, for percentage on tolls for the season of 1843. In this case an agreement had been entered into by the proprietors of boats on the Erie and Oswego canals, to regulate the price of freight and passage by a uniform scale to be fixed by a committee chosen by themselves, and to divide the profits of their business according to the number of boats employed by each, with a provision in the contract prohibiting the members from engaging in similar business out of the association, and it was held that the tendency of such an agreement was to pre-

vent wholesome competition, and was therefore against public policy, and void.

The case of Association v. Kock, 14 La. Ann. 168, was a contract between several persons engaged in selling bagging, to the effect that none of them should sell any bagging without the consent of a majority, and providing a penalty of $10 for each bale of bagging sold in violation of the agreement, and the action was to recover penalties under the agreement, amounting to $7,400. The court in that case decided that the contract was a combination in restraint of trade, for the reason that its purpose was to enhance the market price of an article of prime necessity to cotton planters, and was therefore contrary to public policy, and could not be enforced.

The Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173, was an agreement between five coal companies to divide two coal regions of which they had control, and to appoint a committee to take charge of their interests, which committee was to decide all questions, and appoint a general agent at Watkins, N. Y.; the coal mined to be delivered through him. Each corporation was to deliver its proportion, at its own cost, in the different markets, at such time, and to such persons, as the committee might direct, and the committee to adjust the prices and rates of freight. By the terms of the agreement the companies might sell their coal themselves, however, to the extent only of their proportion; the agent to have the power to suspend shipments of either beyond their proportion. Prices were to be averaged, and payments made to those in arrear by those in excess. Neither party to the contract was to sell coal otherwise than specified in the agreement. The action was to recover on a bill of exchange drawn for balances under this contract. It was held that there could be no recovery, for the reason that the contract under which the balances were claimed was void as against public policy.

The case of Craft v. McConoughy, 79 Ill. 346, was an action for a division of profits under a contract between grain dealers at the town of Rochelle, in Illinois, in which it was provided:

"Each separate firm shall conduct their own business as heretofore, as though there were no partnership in appearance, keep their accounts, pay their own expenses, ship their own grain, and furnish their own funds to do business with; prices and grades to be fixed from time to time as convenient, and each one to abide by them. All grain taken in store shall be charged 1½ cents per bushel monthly. No grain to be shipped by any party at a less rate than 2 cents per bushel."

The court held the agreement void, as in restraint of trade, for the reason that, while the agreement upon its face seemed to indicate that the parties had formed a partnership for the purpose of controlling the trade in grain, yet, from the terms of the contract and other proof in the record, it was apparent that the object was to form a secret combination, which would stifle all competition, and enable the parties by secret and fraudulent means to control the price of grain, cost of storage, and expense of shipment; adopting the language of the court:

"In other words, the four firms, by shrewd, deep-laid, secret combination, attempted to control and monopolize the entire grain trade of a town and surrounding country."

In the case of Salt Co. v. Guthrie, 35 Ohio St. 666, the contract was for the purposes of regulating the prices and grade of salt. By the terms of the agreement each member of the association was prohibited from selling any salt during the continuance of the association, except at retail, and then only to actual consumers at the place of manufacture, and at the prices fixed by the directors from time to time. The action was to recover the possession of 1,000 bushels of salt manufactured under the contract. The court denied the plaintiff's right to recover, stating: "The clear tendency of such an agreement was to establish a monopoly, and to destroy competition in trade," and for that reason, on grounds of public policy, courts will not aid in its enforcement.

The case of Texas & P. Ry. Co. v. Southern Pac. Ry. Co., 41 La. Ann. 970, 6 South. Rep. 888, was a suit for specific performance of a contract to divide net earnings between competitive points. The court declined to specifically enforce the contract, saying—

"That all contracts which have a tendency to stifle competition or to create or foster monopolies with the view of unreasonably increasing the market value of commodities are against public interest, and contrary to public policy."

The case of Anderson v. Jett, (Ky.) 12 S. W. Rep. 670, was another case of a contract to divide net earnings, and it was there held that, where the object or tendency of the agreement was to prevent or impede free and fair competition in the trade, and where the agreement might in fact have that tendency, it was void, as being against public policy.

The case of Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. Rep. 553, was a contract for a settlement between certain gas companies, which the plaintiff procured, and for his services in procuring the agreement he sought to recover. The object and purpose of the contract was to regulate the price of gas in the city of Baltimore, and provided, among other things, that the rate should not be changed except by mutual agreement of the parties, and that the entire receipts from the sale of gas should be proportioned and divided between the companies in fixed ratios, without regard to the gas actually supplied by either; and also prohibited one of the companies from laying any more pipes for the purpose of supplying the city with gas, and provided that in the future all pipes or mains should become the property of the other company; and also provided that either party violating the terms of the contract should pay to the other company the sum of $250,000 as liquidated damages. The court in this case, speaking by Chief Justice Fuller, said:

"Courts, decline to enforce contracts which impose a restraint, though only partial, upon business of such character that restraint to any extent will be prejudicial to the public interest; but where the public welfare is not involved, and the restraint upon one party is not greater than protection to the other party requires, a contract in restraint of trade may be sustained."

Thus it will be seen that the question whether or not the contract is prejudicial to public interest is in this case made the test. If it is prejudicial to public interest, then it cannot be sustained, even where the restraint is only partial, because in contravention of public pol-

icy;, where it is not, it may be sustained. It has been decided in a great many cases that contracts in restraint of trade were perfectly valid, even where they prevented the party from engaging in the business, which was the subject-matter of the contract, within the entire state where the contract was made; the test being whether the contract was reasonable, and whether or not it was prejudicial to the public interest.

Roller Co. v. Cushman, 143 Mass. 353, 9 N. E. Rep. 629; Davis v. Mason, 5 Term R. 120. In this case Lord Kenyon, in sustaining an agreement restraining a surgeon from practicing his profession within five miles from a certain town, said—

"That the public were not likely to be injured by the agreement, since every other person was at liberty to practice as a surgeon in the town."

To the same effect is Homer v. Ashford, 3 Bing. 322. In the case of Cloth Co. v. Lorsont, L. R. 9 Eq. 345, the court, in passing upon the validity of a contract in general restraint, which extended throughout the whole kingdom, said:

"All the cases, when they come to be examined, seem to establish this principle: that all restraints upon trade are bad, as being in violation of public policy, unless they are natural, and not unreasonable, for the protection of the parties in dealing legally with some subject-matter of contract. The principle is this: Public policy requires that every man shall be at liberty to work for himself, and shall not be at liberty to deprive himself or the state of his labor, skill, or talent by any contract that he enters into. On the other hand, public policy requires that when a man has by skill or by any other means obtained something which he wants to sell, he should be at liberty to sell it in the most advantageous way in the market; and, in order to enable him to sell it advantageously in the market, it is necessary that he should be able to preclude himself from entering into competition with the purchaser. In such a case the same public policy that enables him to do that does not restrain him from alienating that which he wants to alienate, and therefore enables him to enter into any stipulation, however restrictive it is, provided that restriction, in the judgment of the court, is not unreasonable, having regard to the subject-matter of the contract."

See, also, Hubbard v. Miller, 27 Mich. 15; Thermometer Co. v. Pool, 51 Hun, 157, 4 N. Y. Supp. 861; Gloucester Isinglass & Glue Co. v. Russia Cement Co., 154 Mass. 92, 27 N. E. Rep. 1005; Beal v. Chase, 31 Mich. 490; Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. Rep. 419; Navigation Co. v. Winsor, 20 Wall. 64.

The case last referred to was a contract in which a party engaged in navigating the waters of California alone sold a steamer to other parties, who were engaged in navigating the Columbia river, in Oregon and Washington territories; and it was agreed between the parties that the purchasers of the steamer should not employ it or suffer it to be employed for 10 years from the date of sale in any waters of California. Three years afterwards, the purchasers, under this contract, sold the steamer to a party engaged in navigating Puget sound, subject to the stipulation that she should not be run or employed on any routes of travel on the rivers, bays, or waters of the state of California or the Columbia river and its tributaries for the period of 10 years. The supreme court held the contract valid. Mr. Justice Bradley, speaking for the court, said:

"It is a well-settled rule of law that an agreement in general restraint of trade is illegal and void, but an agreement which operates merely in partial restraint of trade is good, provided it be not unreasonable."

Again, in the same case, the learned justice takes occasion to say that—

"Cases must be adjudged according to their circumstances, and can only be rightly judged when the reason and grounds for the rule are carefully considered. There are two principal grounds on which the doctrine is founded that a contract in restraint of trade is void as against public policy: One is the injury to the public by being deprived of the restricted party's industry; the other is the injury to the party himself by being precluded from pursuing his occupation, and thus being prevented from supporting himself and his family. It is evident that both these evils occur when the contract is general not to pursue one's trade at all, or not to pursue it in the entire realm or country. The country suffers the loss in both cases; and the party is deprived of his occupation, or is obliged to expatriate himself in order to follow it. A contract that is open to such grave objections is clearly against public policy. But if neither of these evils ensue, and if the contract is founded on a valid consideration and a reasonable ground of benefit to the other party, it is free from objection, and may be enforced."

I think the cases are uniform to the effect that, where the contract is publicly oppressive, and the restrictions are broader than are necessary for the legitimate protection of the other party to be benefited by the contract, then the contract is unreasonable,—a contract in restraint of trade,—and therefore void; otherwise not. Undoubtedly all contracts which have a direct tendency to prevent healthy competition are detrimental to the public, and, therefore, to be condemned; but when contracts go to the extent only of preventing unhealthy competition, and yet at the same time furnish the public with adequate facilities at fixed and reasonable prices, and are made only for the purpose of averting personal ruin, the contract is lawful. The rule of law which recognizes the rights of the public to have the benefit of fair and healthy competition, and to require that equal facilities and reasonable rates shall be secured to all, does not condemn a contract between railway companies operating competing lines, which is made for the sole purpose of preventing strife, and preventing financial ruin to one or the other, so long as the purpose and effect of such an agreement is not to deprive the public of its right to have adequate facilities and fixed and reasonable prices. On the contrary, such agreements, instead of being obnoxious to the law, because detrimental to the public interest, are to be upheld, for the reason that they benefit the public by preventing unjust discrimination among shippers, and providing equal facilities for the interchange of traffic, and thus avoiding many of the unfair and unjust results which often follow the unrestricted competition of rival companies. Applying this rule to the contract complained of in the case at bar, can it be said that the contract is unlawful? I think not. The allegation of fact in the answer (which is to be taken as true) is that the object and purpose of the agreement and the formation of the association thereunder was to maintain just and reasonable rates, and to prevent unjust discriminations, in compliance with the terms of the act regulating commerce, by furnishing equal facilities for the interchange of traffic between the several lines. How, then, can it be said that the

public is injuriously affected by this agreement? The rates or charges are uniform and reasonable, and unjust discriminations are prohibited. Equal facilities for the interchange of traffic are provided for; hence no right to which the public is entitled is violated. The term "competition" must not be construed to apply solely to the question of rates. There are many other considerations included within the term. There may be very active competition between these railway lines outside of the question of rates, viz. by offering to the public advantages in the matter of equipment, facilities at feeding stations for the proper care of live stock, shortening the time, and in many other ways the most active competition may prevail, all of which the public receives the benefit of; and so long as the rate charged is fair and reasonable, as stated in the answer, which must be construed to mean no more than a fair compensation to the carrier for the services performed, the public cannot complain.

As stated by Christiancy, J., in the case of Beal v. Chase, reported in 31 Mich. 521:

"The public is quite as much interested in the prosperity of its citizens in their various avocations as it can possibly be in their competition. The latter may bring low prices to purchasers, but may also bring them so low that capital becomes unprofitable, and business men fail, to the general injury of the community."

I think that it cannot be said that the public is benefited by competition when that competition is carried beyond the bounds of reasonable prosperity to the parties engaged in it, for surely the citizen investing his capital, whether in railways or otherwise, is entitled to the benefit of a contract which affords to him only a fair protection for his investment, and which does not interfere with the rights of the public by imposing unjust and and unreasonable charges for the service performed. Such contracts, as was stated in the case of Homer v. Ashford, "are not injurious restraints of trade, but securities necessary for those engaged in trade. The effect of such a contract is to encourage, rather than cramp, the employment of capital in trade, and to promote industry." Applying this rule to the agreement under consideration, my own view is that it is not an agreement, combination, or conspiracy in restraint of trade, in violation of the first section of the act of July 2, 1890.

It is further urged by counsel for the government that this association unavoidably tends to a monopolization of trade and commerce, and for that reason is in violation of the second section of the act of July 2, 1890. A "monopoly" is defined by Mr. Justice Story to be "an exclusive right, granted to a few, of something which was before of common right;" and by Lord Coke to be "an institution by the king, by his grant, commission, or otherwise, to any persons or corporations, of or for the sole buying, selling, making, working, or using of everything whereby any persons or corporations are sought to be restrained of any freedom or liberty they had before, or hindered in their lawful trade." While it is undoubtedly true that these railroad companies perform quasi public functions, and for that reason owe certain duties to the public, yet, after a careful examination of this contract, I must confess that I have been unable to discover in

it a single element of a monopoly, especially as defined at common law. While it is true that the public are entitled to adequate facilities and to just and reasonable rates at the hands of these corporations, they are entitled to just that, and no more; and the allegation of the answer is that this was the very purpose of the contract. In view of this allegation,—which is to be taken as true in this case,—I do not see how it can be said that the contract tends to create a monopoly when, by its very terms, everything to which the public is entitled is provided for, and the public interest fully protected. But it is urged by counsel for the government that this should be held to be a contract tending to monopolize trade and commerce, for the reason that its tendency is to prevent free and unrestricted competition. What I have said in reference to competition in discussing contracts in restraint of trade is equally applicable here. My own view is that the contention of counsel is altogether too broad. The public is not entitled to free and unrestricted competition, but what it is entitled to is fair and healthy competition; and I see nothing in this contract which necessarily tends to interfere with that right.

Again, it is urged that this contract amounts to the transfer of the franchises and corporate powers of these railway companies, and that the contract, therefore, is forbidden by public policy. There is no doubt but what it is beyond the power of a corporation to disable itself by contract so that it cannot perform every public duty which it has undertaken. Mr. Justice Miller, in delivering the opinion of the court in the case of Thomas v. Railway Co., 101 U. S. 71, says:

"Where a corporation, like a railroad company, has granted to it, by charter, a franchise intended in a large measure to be exercised for the public good, the due performance of those functions being the consideration of the public grant, any contract which disables the corporation from performing those functions, which undertakes, without the consent of the state, to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the burden which it imposes, is a violation of the contract with the state, and is void, as against public policy."

But wherein the principle announced in this case can be applied to the contract under consideration, I am wholly unable to perceive. In what manner are the franchises or corporate powers of any of these railway companies transferred to this association? Each company maintains its organization as before, elects its officers and operates its line in exactly the same manner now as it did before the organization of the association. No powers whatever are given to the association to govern in any respect the operations or methods of transacting the business of any of the lines. Each line is left perfectly free to transact all of the business it can secure, and in its own way. True, the contract requires that each company shall charge just and reasonable rates, and also contains provision for regulating changes in rates; but wherein is this a surrender of any corporate franchise into the hands of an irresponsible power? The contract provides that this association shall consist of a representative of each of the lines. This representative may or may not be an officer of the company. Suppose we concede that he is not, but is a person appointed by the officers of the company authorized to make such appointment, he

then becomes the agent of the company for that purpose, and he may lawfully act on its behalf, and hence his act would be the act of the company through its duly-authorized agent, and the rate, rule, or regulation made by the association and put into effect by any company, party to the agreement, would not be merely the rate, rule, or regulation of the association, but a rate, rule, or regulation of the company itself, acting through its proper officers or agents, and hence no surrender or transfer of any corporate power conferred upon it by its charter; nor would it be thereby relieved of any burden imposed.

One further question remains in this case: Does the provision of the act of July 2, 1890, relate to the business of common carriers, or, in other words, does it include, and was it intended to include, combinations or agreements between railway companies? It is urged by the defendants that they are not included within that act; that the provisions of the act operate, and were intended to operate, upon other and different combinations, and that they have no application to agreements or combinations between railway companies, for the reason that congress had already provided by the act of February 4, 1887, entitled "An act to regulate commerce," a full and comprehensive code of railway regulation, modeled on the most effective systems of the different states and of England. This last-mentioned act may be summarized as follows: That the provisions of the act shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad or partly by railroad and partly by water. It provides that all charges for services shall be reasonable and just; that unjust discriminations and undue or unreasonable preferences shall not be made; that reasonable, proper, and equal facilities for the interchange of traffic between lines, and for the receiving, forwarding, and delivering of passengers and property between connecting lines shall be provided; that there shall be no discrimination in the rates and charges as between connecting lines; that it shall be unlawful to charge a greater compensation for a short haul than for a long haul over the same line, in the same direction, under substantially similar circumstances; that there shall be no pooling of earnings. The act provides for the filing and publication of tariffs, including joint tariffs of connecting roads, and also provides for 10 days' notice of any advance in rates.

The act further provides that any combination, contract, or agreement, express or implied, to prevent, by change of time schedules, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from the place of shipment to the place of destination, shall be unlawful. The act provides penalties for violations of its provisions, establishes a commission of five members to exercise a supervisory control over the common carriers subject to the act, and to enforce the provisions of the act. It will be seen from an examination that this act is in the nature of a special act, being confined in its application to common carriers, while the act of July 2d is clearly, by its terms, a general statute. It includes every contract or combination in the form of a trust or otherwise, or conspiracy in restraint of trade, and every person who shall monopolize or attempt to monopolize any part of the trade and commerce

among the states. I think no rule is better settled than, where a general statute has been enacted, which might include, in the absence of other provisions, a subject-matter which has already received consideration at the hands of the legislature by a special act, that the general act will not be construed to embrace the subject contained in the special act, unless it clearly appears from the language employed that it was the intention of the legislature that it should be included. The intention of the legislature should, of course, be followed, and that is to be ascertained from the words used in the statute, and from the subject to which the statute relates, with a view of meeting the mischief sought to be remedied; and in doing this it is the duty of the court to restrict the meaning of general words whenever it is satisfied that the literal meaning would extend the statute to cases which the legislature never designed to include. As stated by Mr. Justice Davis in the case of Reiche v. Smythe, 13 Wall. 164:

"If it be true that it is the duty of the court to ascertain the meaning of the legislature from the words used in the statute, and the subject-matter to which it relates, there is an equal duty to restrict the meaning of general words whenever it is found necessary to do so in order to carry out the legislative intention."

It is equally the duty of the court to give to these statutes such a construction that both may stand, if that can be done. Applying these rules, can it be said that it was the intention of congress to include common carriers subject to the act of February 4, 1887, within the provisions of the act of July 2d? I think it very clearly appears from an examination of these statutes, and considering the evil sought to be remedied, that such was not the intention of congress.

The whole subject relating to common carriers had already been carefully provided for by the act of February 4, 1887, and a commission appointed, whose duty it was to see to it that the carriers subject to that act complied with its requirements, with power to the courts, when necessary, to enforce its provisions; hence it is but reasonable to presume that if congress had considered anything in addition necessary for the proper regulations and control of these carriers, it would have provided for it by an amendment of that act, instead of including it in a general statute, some of the provisions of which would necessarily conflict with the legislation then in force upon a subject which had already received the special consideration of congress. I think it was the purpose of congress to remedy a very different evil then existing. A number of combinations in the form of trusts and conspiracies in restraint of trade had sprung up in the country which were dangerous to its commercial interests; for example, the steel-rail trust, cordage trust, the whisky trust, the Standard oil trust, dressed-beef trust, the school-book trust, the gas trust, and numerous other trusts and combinations, which threatened to destroy the commercial and industrial prosperity of the country. These trusts assumed the absolute control of the various corporations entering into them, directing which of the constituent members of the trust should continue operations and which should cease doing business; how much business should be transacted by each, what prices should be

charged for their product, and in fact had the power to direct every detail of the business of every corporation forming the trust. It was to combinations and conspiracies of this sort that the act of July 2, 1890, was directed. I conclude, therefore, that the bill should be dismissed, and it is so ordered, but not at the cost of the complainant.

NOTE

Memorandum of agreement: "Memorandum of agreement made and entered into this fifteenth day of March, 1889, by and between the following railroad companies, .viz.: Atchison, Topeka & Santa Fe R. R., Chicago, Rock Island & Pacific Ry., Chicago, St. Paul, Minneapolis & Omaha Ry., Burlington & Missouri River R. R. in Nebraska, Denver & Rio Grande R. R., Denver & Rio Grande Western Ry., Fremont, Elkhorn & Missouri Valley R. R., Kansas City, Ft. Scott & Memphis R. R., Kansas City, St. Joseph & Council Bluffs R. R., Missouri Pacific Ry., Sioux City & Pacific R. R., St. Joseph & Grand Island R. R., St. Louis & San Francisco Ry., Union Pacific Ry., Utah Central Ry., and such other companies as may hereafter become parties hereto,—witnesseth, for the purpose of mutual protection, by establishing and maintaining reasonable rates, rules, and regulations on all freight traffic, both through and local, the subscribers do hereby form an association, to be known as the Trans-Missouri Freight Association, and agree to be governed by the following provisions:

"Article 1. The traffic to be included in the Trans-Missouri Freight Association shall be as follows: (1) All traffic competitive between any two or more members hereof, passing between points in the following described territory: Commencing at the Gulf of Mexico, on the 95th meridian, thence north to the Red river; thence via that river to the eastern boundary line of the Indian Territory; thence north by said boundary line and the eastern line of the state of Kansas to the Missouri river at Kansas City; thence via the said Missouri river to the point of intersection of that river with the eastern boundary of Montana; thence via the said eastern boundary line to the international line,—the foregoing to be known as the 'Missouri River line;' thence via said international line to the Pacific coast; thence via the Pacific coast to the international line between the United States and Mexico; thence via said international line to the Gulf of Mexico; and thence via said Gulf to the point of beginning, including business between points on the boundary line as described. (2) All freight traffic originating within the territory as defined in the first section when destined to points east of the aforesaid Missouri river line. Exceptions: (a) The D. & R. G. and the D. & R. G. W., except their business to and from points in Colorado west of the D. & R. G. line between Denver and Trinidad; also business via their lines between points in Colorado and points in Utah. All local business between Denver and Trinidad and intermediate points; all local business of the A., T. & S. F. between Pueblo and Canon City, Colo.; all stone traffic having both origin and destination within the state of Colorado. The jurisdiction of this association, in so far as the business of the Denver & Rio Grande Railroad and the Denver & Rio Grande Western Railway Companies is concerned, covers the following traffic. namely: All freight traffic to, from, or through all common or junction points in the states of Nebraska and Kansas and the Indian Territory, originating at or destined to Denver, Colorado Springs, Pueblo, or Trinidad. All freight traffic. between Ogden, Spanish Fort, and intermediate points on the one hand, and to, from, or through points in Kansas or Nebraska upon or east of the 103d meridian, cn the other hand. Traffic which may be excluded under the application of the above is only such as may be delivered to or received from the Denver & Rio Grande Railroad and Denver & Rio Grande Western Railway. (b) Traffic included in the Trans-Continental and International Association. (c) Traffic passing between points in Kansas or Nebraska and Mississippi river points, Carondelet and south; also traffic passing between points in Kansas or Nebraska and points in the southern states east of the Mississippi river and south of the south line of Kentucky and Virginia, regardless of the route by which the business crosses the Mississippi or Ohio rivers. (d) Traffic passing between Missouri river points and points in the

territory east of said river   (e) All traffic to points on the Northern Pacific and Manitoba Railways. (f) Traffic to points in Arkansas. (g) Coal, stone, and gravel from Colorado, Wyoming, and Dakota, to points in Kansas and Nebraska, and to Sioux City, Council Bluffs, or Pacific Junction, Iowa, St. Joseph, Kansas City, or Boswell, Missouri. (h) The interchange of traffic with the Colorado Midland and South Park Companies, to or from Aspen, Colorado, Glenwood Springs, Colorado, and intermediate points, including coal branches therefrom, and Buena Vista, Colorado, and Leadville, Colorado. (i) Business to and from Florence, Colorado, by all lines.

"Art. 2. Section 1. The association shall, by unanimous vote, elect a chairman of the organization. The chairman may be removed by a two-thirds vote of the members. Sec. 2. There shall be regular meetings of the association at Kansas City, unless notice shall be given by the chairman that the business to be transacted does not warrant calling the members together, which notice shall be given not less than four days before the day set for the meeting. When a meeting—regular or special—is convened it shall be incumbent upon each party hereto to be represented by some officer authorized to act definitely upon any and all questions to be considered. Each road shall designate to the chairman one person, who shall be held personally responsible for rates on that road. Such person shall be present at all regular meetings, when possible, and shall represent his road, unless a superior officer is present. If unable to attend, he shall send a substitute, with written authority to act upon all questions which may arise, and the vote of such substitute shall be binding upon the company he represents. Sec. 3. A committee shall be appointed to establish rates, rules, and regulations on the traffic subject to this association, and to consider changes therein, and make rules for meeting the competition of outside lines. Their conclusions, when unanimous, shall be made effective when they so order, but if they differ, the question at issue shall be referred to the managers of the lines parties hereto, and if they disagree, it shall be arbitrated in the manner provided in article 7. Sec. 4. At least five days' written notice prior to each monthly meeting shall be given the chairman of any proposed reduction in rates or change in any rule or regulation governing freight traffic,—eight days in so far as applicable to the traffic of Colorado or Utah. Sec. 5. At each monthly meeting the association shall consider and vote upon all changes proposed, of which due notice has been given, and all parties shall be bound by the decision of the association, so expressed, unless then and there the parties shall give the association definite written notice that in 10 days thereafter they shall make such modification, notwithstanding the vote of the association: provided that, if the member giving notice of change shall fail to be represented at the meeting, no action shall be taken on its notice, and the same shall be considered withdrawn. Should any member insist upon a reduction of rate against the views of the majority, or if the majority favor the same, and if, in the judgment of such majority, the rate so made affects seriously the rates upon other traffic, then the association may, by a majority vote, upon such other traffic put into effect corresponding rates, to take effect on the same day. By unanimous consent, any rate, rule, or regulation relating to freight traffic may be modified at any meeting of the association without previous notice. Sec. 6. Notwithstanding anything in this article contained, each member may, at its peril, make at any time, without previous notice, such rate, rule, or regulation as may be necessary to meet the competition of lines not members of the association, giving at the same time notice to the chairman of its action in the premises. If the chairman, upon investigation, shall decide that such rate is not necessary to meet the direct competition of lines not members of the association, and shall so notify the road making the rate, it shall immediately withdraw such rate. At the next meeting of the association held after the making of such rate, it shall be reported to the association; and if the association shall decide by a two-thirds vote that such rate was not made in good faith to meet such competition, the member offending shall be subject to the penalty provided in section 8 of this article. If the association shall decide by a two-thirds vote that such rate was made in good faith to meet such competition, it shall be considered as authority for the rate so made. Sec. 7. All arrangements with connecting lines for the division of through rates relating to traffic covered by this agreement shall be made by authority of the

association: provided, however, that when one road has a proprietary interest in another, the divisions between such roads shall be what they may elect, and shall not be the property of the association: provided, further, that, as regards traffic contracts at this date actually existing between lines not having common proprietary interests, the same shall be reported, so far as divisions are concerned, to the association, to the end that divisions with competing lines may, if thought advisable by them, be made on equally favorable terms. Sec. 8. It shall be the duty of the chairman to investigate all apparent violations of the agreement, and to report his findings to the managers, who shall determine by a majority vote (the member against whom complaint is made to have no vote) what, if any, penalty shall be assessed, the amount of each fine, not to exceed one hundred dollars, to be paid to the association. If any line party hereto agrees with a shipper or any one else to secure a reduction or change in rates or change in the rules and regulations, and it is shown upon investigation by the chairman that such an arrangement was effected, and traffic thereby secured, such action shall be reported to the managers, who shall determine, as above provided, what, if any, penalty shall be assessed. Sec. 9. When a penalty shall have been declared against any member of this association, the chairman shall notify the managing officer of said company that such fine has been assessed, and that within ten days thereafter he will draw for the amount of the fine; and the draft, when presented, shall be honored by the company thus assessed. Sec. 10. All fines collected to be used to defray the expenses of the association, the offending party not to be benefited by the amounts it may pay as fines. Sec. 11. Any member not present or fully represented at roll call of general or special meetings of the freight association, of which due and proper notice has been given, shall be fined one dollar, to be assessed against his company, unless he shall have previously filed with the chairman notice of inability to be present or represented.

"Art. 3. The duties and powers of the chairman shall be as follows: Section 1. He shall preside at all meetings of the association, and make and keep a record thereof, and promulgate such of said proceedings as may be necessary to inform the parties hereto of the action taken by the association. Sec. 2. He shall at all times keep and publish for the use of the members a full record of the rates, rules, and regulations prevailing on all lines parties hereto on business covered by this agreement; and each of the parties hereto agrees to furnish such number of copies of the rates, rules, and regulations issued by it as the chairman may require. Sec. 3. He shall construe this agreement, and all resolutions adopted thereunder; his construction to be binding until changed by a majority vote of the association. Sec. 4. He shall publish in joint form all rates, rules, and regulations which are general in their character, and apply throughout the territory of the association, and shall also publish, in the manner above, such rates, rules, or regulations applying on traffic common to two or more lines as may be agreed upon by the lines in interest. Sec. 5. He shall be furnished with copies of all way-bills for freight carried under this agreement, when called for, and shall furnish such statistics as may be necessary to give members general information as to the traffic moved, subject to the provisions of the Interstate Commerce Railway Association agreement as to lines members thereof. Sec. 6. He shall render to each member of the association monthly statements of the expenses of the association, showing the proportions due from each, and shall make drafts on the members for the different amounts thus shown to be due. Sec. 7. He shall hear and determine all charges of violations of this agreement, and assess, collect, and dispose of the fines for such violations, as provided for herein. Sec. 8. The chairman shall be empowered to authorize lines in the association to meet the rates of another line or other lines in the association when in his judgment such action is justified by the circumstances; this, however, not to act in any way as an indorsement of an unauthorized rate made by any member. Sec. 9. Only the parties interested shall vote upon questions arising under the agreement, and in case of doubt the chairman shall decide as to whether any party is so interested or not, subject to appeal, as provided by section 3, article 3, of the agreement.

"Art. 4. Any willful underbilling in weights, or billing of freight at wrong classification, shall be considered a violation of this agreement; and the rules

and regulations of any weighing association or inspection bureau, as established by it, or as enforced by its officers and agents, shall be considered binding under the provisions of this agreement, and any willful violation of them shall be subject to the penalties provided herein.

"Art. 5. The expenses of the association shall be borne by the several parties in such proportion as may be fixed by the chairman. Any member not satisfied with the allotment so made may appeal to the association, which shall, at its first regular meeting thereafter, determine the matter, which may be done by a two-thirds vote of the members.

"Art. 6. There shall be an executive committee of three members, to be elected by unanimous vote. The committee shall approve the appointment and salaries of necessary employes, except that of the chairman, and authorize all disbursements. All action of this committee shall be unanimous.

"Art. 7. In case the managers of the lines parties hereto fail to agree upon any question arising under this agreement that shall be brought before the association, it shall be referred to an arbitration board, which shall consist of three members of the exutive board of the Interstate Commerce Railway Association: provided, however, that in case of arbitration in which the members of this association only are interested, they may, by unanimous vote, substitute a special board.

"Art. 8. This agreement shall take effect April 1, 1889, subject thereafter to 30 days' notice of a desire on the part of any line to withdraw from or amend the same."