INTERSTATE COMMERCE COMMISSION v. SOUTHERN PAC. CO. et al.

(Circuit Court, S. D. California, S. D.    September 6, 1904.)

No. 1,039.

1. CARRIERS—SUIT TO ENFORCE ORDER OF INTERSTATE COMMERCE COMMISSION—ISSUES.

Where the bill in a suit by the Interstate Commerce Commission to enforce obedience to an order requiring a railroad company to desist from the enforcement of a rule promulgated by such company alleges generally that the rule is violative of the interstate commerce act, which allegation the defendant denies, the issue thus raised extends to every possible violation of the act, and the court is not confined to the grounds or reasons assigned by the commission for its conclusion, but may, without going beyond the issue, reach a like or different conclusion on the same or other grounds or reasons.

2. SAME — CONSTRUCTION OF INTERSTATE COMMERCE ACT — PROHIBITION OF POOLING.

Section 5 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]), which provides that "it shall be unlawful for any common carrier subject to the provisions of this act to enter into any contract, agreement, or combination with any other common carrier or carriers for the pooling of freights of different or competing railroads, or to divide between them the aggregate or net proceeds of the earnings of such railroads or any portion thereof," prohibits "contracts" for the division of earnings, and is violated by a contract having that purpose or effect, whether or not an actual division is made.

3. SAME—"FREIGHTS" DEFINED.

The word "freights" in said section is used as meaning the commodities carried, and not the compensation paid for such carriage.

4. SAME—TRAFFIC POOL—RESERVATION BY INITIAL CARRIERS OF POWER TO ROUTE OVER CONNECTING LINES.

A rule and practice adopted and put in force by agreement between competing railroads and their connecting lines, by which a through rate on a certain class of traffic is conditioned on a reservation to the initial carrier of the absolute and unqualified power to route the shipments beyond its own line, for the declared purpose of enabling such initial carriers to control and maintain the rate so fixed by preventing competition, either direct or indirect, between their connecting carriers, create in effect a traffic pool, within the meaning of section 5 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]) and are in violation of said section.

5. SAME.

It is no justification of such rule and practice that they are designed to prevent, and do prevent, unlawful rebates from connecting lines to shippers. Pooling and rebates are both within the prohibitions of the act, and one cannot be lawfully employed as a preventive of the other.

6. SAME—JURISDICTION OF INTERSTATE COMMERCE COMMISSION.

An order of the Interstate Commerce Commission requiring the railroads joining in such agreement to desist from enforcing such rule and practice is not legislative in character, because the rule is embodied in the joint through tariff published by the carriers, where it is also promulgated to the public and enforced against all shippers.

7. SAME—SUITS BY INTERSTATE COMMERCE COMMISSION TO ENFORCE ITS ORDERS.

In a suit to enforce its orders the Interstate Commerce Commission represents the public, and its right to relief is not affected by the fact that the complainants before it may themselves have participated in practices which were unlawful.

In Equity. On final hearing. For opinion on demurrer, see 123 Fed. 597.

L. H. Valentine, U. S. Atty., L. A. Shaver, and J. H. Call, for complainant.

Wm. F. Herrin, Flint & Barker, and T. J. Norton, for defendants.

WELLBORN, District Judge. This proceeding, brought under section 16 of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]); was before me some time ago on demurrer to the complaint, and the order sought to be enforced is set forth in my opinion filed on that hearing and reported in 123 Fed. 598. The defendants are initial carriers for the transportation of citrus fruits of southern California to points on and east of the Missouri river. The termini of the Southern Pacific Company are at Ogden and El Paso. The Santa Fé terminal is at Chicago. The points of destination located beyond these termini are reached through connecting carriers. Pursuant to a previous agreement between the defendants and their Eastern connections, effected through correspondence opened by the circular letter of R. H. Countiss, agent, dated October 9, 1899, hereinafter set forth, and sent out at the instance of defendants to their said connections, a joint tariff relating to citrus fruits, and fixing a through rate thereon of $1.25 per 100 pounds, from southern California to all points east of the Missouri river, was filed with the Interstate Commerce Commission, on January 1, 1900. Said tariff embodies, among other things, the rule or regulation, whose enforcement the order of the commission forbids, and which was one of the terms of said agreement, and which, with the directions given by defendants to their agents, is as follows:

"In guarantying the through rate named herein, the absolute and unqualified right of routing beyond its own terminal is reserved to initial carrier giving the guaranty. In accordance with this rule, agents will not accept shipping orders or other documents, if routing instructions are shown thereon. Neither will agents accept verbal routing instructions."

Prior to said agreement the keen rivalry existing between defendants' Eastern connections led to a far-reaching system of rebates, which was violative of the commerce act, and cannot be too strongly reprobated. Among the participants in this system were certain incorporated companies owning ventilator or refrigerator cars, which were peculiarly adapted to the carriage of citrus fruits, and were hired by the initial carriers because they did not want to own equipment which they could keep in service only a part of the year, while the car companies could use the equipment for other business in other parts of the United States during the lull in the orange trade. Mr. Morton, then second vice president of the Atchison, Topeka & Santa Fé Railway Company, after testifying, in effect, that these car companies made arrangements with the connections of his company east of Chicago and the Southern Pacific connections east of its different termini to get a certain bonus of from $10 to $40 per car in consideration of the car being routed over the line paying the bonus, a part of the bonus, varying from one-quarter or less to one-half, being usually turned over to the shipper by the car company for the privilege allowed it of rout-

ing the shipment; that the connections of the Southern Pacific Company between Ogden and the Missouri river would pay $15 per car, and the connections between the Missouri river and Chicago would pay $10 a car, making $25 a car that the Atchison System would have to pay or forego the business; that it made no difference to the Atchison System whether the cutting in the rate was entirely west of Ogden, or east of Ogden, or at El Paso, or whether the cut was made by the Southern Pacific, or by some connection of the Southern Pacific; that, so far as cuts in the rate east of Chicago were concerned, the Atchison System was generally able to secure for oranges moving over its line the same concession made on shipments originating on the Southern Pacific coming east by the Southern Pacific, the Atchison System paying over to the shipper what it received from the connecting line—proceeds as follows:

"Now, it cost our car company the last year, the year preceding 1900, quite a large amount of money to meet this competition, and shippers in southern California who did not get the full benefit of this reduction, and who had to divide it with Mr. Earl and others, naturally were indignant, and it was in order to prevent that state of affairs solely, and for no other reason in the world than to maintain legal rates, that we took the routing of this business into our own hands. * * * Q. You stated a moment ago, as I understood, that your sole object in assuming control of the routing was to put an end to this rebate and cutting of the legal published tariffs? A. Yes. * * * Certainly. This cutting of rates was all done secretly. There was no publication of tariffs, or anything of the kind. It was all in violation of the interstate commerce act. Q. And in violation of your published tariff? A. And in violation of our published tariff. Q. That is what I wanted to get at. Now, you stated that the sole purpose of assuming control of the routing was to do away with the condition that you have described. A. That was, I won't say the sole purpose, but the chief purpose. I might say the sole purpose was to maintain our rates. * * * Q. Now, you have stated the purpose of taking into your hands the routing of this citrus business, namely, the stopping of rebates and this secret cutting of the published tariff rates. Was this stopped? A. It was. Q. Definitely and fully? A. Absolutely. Q. And in the opinion of the Interstate Commerce Commission the statement is made that it is not clear how that would stop it. Could you illustrate or explain how? A. Well, every connection was given to understand that, in case they were found offering concessions for this citrus fruit business after the 1st day of January, 1900, we would see to it that the business was diverted from their lines; and I remember going so far as to say that, if I found anybody cutting our through rates secretly after the 1st of January, 1900, we would not only divert the citrus fruit business from them, but we would take away other business; that it was our intention that the published tariff rates should be absolutely maintained; and that was done in the interest of the small shipper, and in the interest of not having any discrimination in that business. Q. If the initial carrier assumed the routing of the shipment, the connecting carrier would be in no position to bid for the business of a connecting line, would it? A. No. When we took the routing of this business into our hands, the Eastern connection had to do business with us, instead of the car company or the shipper."

Mr. W. A. Bissell, assistant traffic manager of the same company, testifies on this subject as follows:

"Q. Had the business of citrus fruit shipping been leaving you before you established this practice of routing? A. Yes, sir. We made several endeavors. We tried the costly experiment of being honest in this thing, living up to the law as we understood it, and declining to pay rebates; and we lost so much business that we found we had got to do as the Romans did, and, as there seemed to be an idea that the car lines were exempt from the interstate law,

which provided imprisonment for railroad men caught doing this thing, we had to arrange to do our business through an outside car line. Q. Did you have a car line operating on the Santa Fé? A. Well, we had. We didn't have an outside organization until this rebate business came up. We then provided an outside organization, and leased our cars to it, in order to endeavor to hold the business to us that we thought rightfully belonged to us. Q. Well, how long did the business go on, in this way, after the giving of rebates through the car line that you mentioned? A. Well, I can't remember, without looking up the data. I should say a couple of years, anyway. It may have been longer. Q. Well, what was the result of the practice as to being satisfactory or otherwise? A. Well, it was very unsatisfactory. It was unsatisfactory to every one; unsatisfactory to the lines between here and Chicago, to the initial lines that originated the business, and also to the connections. Q. Did your Eastern connections express dissatisfaction about it? A. They expressed dissatisfaction to me every time I talked to them; but they were afraid to take any steps that would debar them from this business. They felt that they had to, in order to maintain their prestige, carry a certain amount of this business. Q. Well, what do you mean by that? A. Well, any man that is at the head of the traffic department of a railroad does not want his competitors to get away with all the orange business, or all of any other kind of business. He wants his share, even if he does not make any money out of it. Q. So that they would take it, notwithstanding that the rebates might reduce the profits to little or nothing? A. Yes, sir. Q. Is that what you mean? A. They so expressed themselves to me. Q. Now, during this two years, you say, that this pulling and hauling of rebates was going on, you were conferring with your Eastern connections about this plan to prevent the practice? A. Well, I talked it over with them more or less; yes, sir. Q. Well, what did you finally determine on doing? A. Well, we came to the conclusion that we would have to avail ourselves of the right which we believed we possessed of routing this business, and, after having talked the matter over with the other roads interested, we made up our minds to undertake it. Q. Have you any correspondence with Eastern connections on that subject, or copies of correspondence? A. Well, I have some copies of correspondence with our Eastern connections which occurred after we had made up our minds what we were going to do. I have no correspondence that took place with them prior to that time. I talked it over with them, but I never wrote to them about it. It was not one of those things that you wanted to write about very much."

Mr. Bissell further testifies thus:

"Q. What was the object of the Santa Fé companies in preventing this giving of rebates and in putting forth the rule to control the routing? A. The object was to be relieved of the dangerous practices that were in vogue, to obtain control of their own equipment or the equipment that was assigned to their lines over their own road, and to enable them to get compensation for the services that they were performing, without violating the law either directly or indirectly. * * * Q. In the opinion of the commission, to which I have referred, there is some question—I am not able to find it right now—about the good faith of your action in assuming control of the routing. I want to put the question to you directly as to whether your purpose was to prevent the giving of rebates and to maintain the lawful published tariff rates—to prevent cutting, as you have stated? A. That was our sole object. It had nothing beyond that."

Mr. William Sproule, freight traffic manager of the Southern Pacific Company, testifies as follows:

"Q. Now, permit me to ask you just there. You have spoken here of the competition of the Santa Fé exercised through the medium of its car lines. Do I understand you to say that the car lines operating on the Santa Fé rails, as was suggested here this afternoon, did pay rebates or make concessions? A. Yes, sir. They had to, or they could not get any share of the business. Q. Now, then, was the demand made upon you by your Eastern connections

that you should follow suit with the Santa Fé and make rebates yourself, in order to meet that condition and that competition? A. They wanted us to join them in meeting the competition as they found it. The competition that our connections found was as much the competition of our other railroad connections, their competitors, although our connections, as it was the Santa Fé. But by this time the demoralization had spread so that there was no line handling oranges, except the line that would pay these rebates, whether by car mileage or other devices; generally, as I have stated, car mileage. It can be laid down that every road east of Ogden, El Paso, and Albuquerque that was handling oranges was being bled. Q. Now, you say that your connections appealed to you to relieve them from that situation? A. Yes, sir. Q. From being compelled to submit to these rebates? A. Precisely so. Q. The idea was the restoration of a normal tariff, was it not? A. The restoration of the tariff that they had joined us in making, and out of which they expected to get their stand; their regular percentage of revenue in accordance with the current division sheets. Instead of that, there was a published tariff under which they were supposed to be doing the business, and in relation to which the effect of it was that it was another tariff altogether, because they had certain slices to be cut off of it in order to pay these illicit rebates, and the business, consequently, was done by our connecting roads at a reduced figure—lower revenue. Q. Now, to relieve that situation and demoralization, the initial carriers undertook to make effective the right of routing the commodity over the connecting lines? A. For that reason, and for the reason that we did not want ourself to be drawn into those practices. Q. Yes. Now— A. And for the further reason, of course, as I have already said, that it complicated our entire relations with connecting lines and impaired our own ability to handle the traffic."

Again Mr. Sproule says:

"Well, when we undertook to control the routing, we— The agent of the Transcontinental Bureau, Mr. Countiss, was authorized by me to send a letter to every one of our connections to state that a new tariff would be issued on citrus fruits. I should explain, perhaps, that the Transcontinental Bureau is simply a publication office. It is a clearing house for information—that is, to save printers' ink—and is used by all the roads west of the Missouri river that engage in transcontinental traffic. It is used for that purpose. I authorized him to write a letter to each of our connections, stating that the present tariff would be canceled and a new one issued, covering citrus fruits; that to this tariff only such roads would be made parties as would enter into an undertaking to maintain the tariff absolutely, without any refund of any sort by any device, whether to shippers, consignees, connecting roads, or to car lines; that if the answers were evasive they would be considered as in the negative. That was the only provision we called for, and the only provision we wanted. I have the correspondence with me at the hotel, copies of it, if it be desired to have it here."

The following is a copy of the Countiss letter:

"Citrus Fruit Tariff.

"San Francisco, Oct. 9, 1899.

"Dear Sir: At a conference held in this city on the 6th and 7th inst., at which the California terminal lines and their direct connections were represented, special consideration was given to citrus fruit tariff, and in order to effectively promote the observance of the interstate commerce act, thereby conserving the lawful interests of all concerned in the traffic, it was—

"Resolved, that current citrus fruit tariff be canceled November 14th, 1899, and taking effect November 15th, 1899, Agent Countiss publish for each of the roads represented at this conference a tariff in connection with specified routes, comprising roads that give express assurance that they will not deviate from the rates provided therein, directly or indirectly, by any method or device, whether in conjunction with carriers, shippers, consignees, or car lines. In full assurance of their good faith, each road, in consideration of being

132 F.—53

made a party to the new tariff, shall give its assent to the cancellation of said tariff so far as its own road is concerned, in event that rates are not absolutely maintained by it as contemplated in foregoing. Further, said tariff shall bear the following lawful provision: 'In guarantying rates, the absolute and unqualified right of routing beyond its own terminal is reserved to initial carrier giving guaranty.'

"May I ask that you promptly advise me as to whether you will give the assurances which, under the above resolution, are requisite to representation to your company in the proposed new tariff, and oblige,

"Yours very truly,                                        R. H. Countiss, Agent."

Referring to said letter, Mr. Sproule further testifies as follows:

"A. That was sent out by Mr. Countiss. Well, there was a volume of correspondence ensued upon that. Some roads expressed themselves frankly as very glad that we had taken the thing in hand, and they gladly complied. Others, who thought it was not a good thing for them, would perhaps try to evade it, and give a qualified assurance, which was not accepted, that leading to an interchange of correspondence. Consequently, when the first tariff was issued under this arrangement, there were several roads omitted that afterwards came in, and subsequent issues of the tariff became necessary to include them. Gradually all important roads came in. Q. What do you mean by 'coming in'? A. They gave their concurrence to that pledge. Q. Promised that they would not rebate? A. Promised that they would not rebate. That is all the pledge that we asked or desired, and was the only condition for joining in that tariff; and as soon as we put it in effect the abuses as to the rates stopped. Q. by Mr. Dunne. So far as you know— A. So far as we have any knowledge. Q. — have any rebates been paid in the citrus fruit business since the tariff—with this condition that the right of routing should be reserved to carrier? A. I have every reason to believe that from January 1, 1900, until this date, there has not been a nickel paid on citrus fruits. Q. Nothing of that kind has been brought to your notice? A. It has completely stamped it out. Q. It is a fact, so far as your observation goes—I think there is some testimony to that effect here—that prior to the enforcement of this routing rule, generally speaking, every car load of citrus fruit paid more or less in rebates? A. In 1899, I doubt whether there was any car load of citrus fruit that moved out of southern California without somebody getting a rake-off on it, although the shipper himself might not get it all."

Mr. Sproule further testifies thus:

"Q. And it was out of that that you came to exercise specially the right of routing in the matter of citrus fruit—out of those conditions, was it not? A. Yes, sir. Q. That is the necessity which you speak of. If a similar necessity, Mr. Sproule, should arise in respect to other commodities, the railroad company would exercise the right with the same directness, would it not, and the same insistence? A. The same— I— We undertook the control of the routing with a good deal of reluctance. We would do it on other commodities with a good deal of reluctance. But if the same condition developed in any other commodity, so that it were the only remedy left us in order to maintain the tariff and obey the law, I don't see that there would be any other recourse left for us."

Mr. Edward Chambers, general freight agent of the Santa Fé lines west of Albuquerque, when testifying as a witness before the commission, in answer to a question as to why the routing rule was applied to the citrus fruit traffic, said:

"A. Well, the main reason was to have the rates maintained."

From these quotations it will be seen that there is no controversy but that the routing rule was agreed upon as a means of maintaining the joint tariff rates, and this designed operation of the rule, which, it

may be here noted, has been entirely effectual, is strongly emphasized by Mr. Morton, in his sworn statement:

"I might say that the sole purpose was to maintain our rates."

It is true that said rule has struck down an unlawful system of rebates. That result, however, which was but incidental, in no way affects the main, and, as will appear later on, pivotal, fact in this case, that the defendants and their Eastern connections, in entering into the contract and combination for routing by the initial carriers, intended thereby to uphold their published rates. Indeed, defendants in their answers say (italics mine):

"This defendant further avers: That during the years from 1890 up to 1900 a practice of paying rebates had grown up among many of the railroads not entering into the state of California, but which were variously interested in having the oranges, lemons, and other citrus fruits shipped from the state of California carried over their lines, or portions thereof, when such lines, or any portion thereof, could form any portion of a route over which such fruits might be shipped. That such payments of rebates were made, either directly or through car-line companies, to the various fruit exchanges and other large shippers of oranges, lemons, and other citrus fruits from southern California, and amounted to from $15 to $25 a car, and were paid for the routing of business over the lines of the railroads paying such rebates, thereby diverting the same from other connecting railroads which did not pay rebates. That these rebates were paid either directly by the railroad companies or through private car-line companies, and were received and retained by the fruit exchanges, commission houses, middlemen, and others who shipped large quantities of oranges, lemons, and other citrus fruits, and were not, as a rule, as this defendant is informed and believes, and charges the fact to be upon its information and belief, received by or of any benefit to the grower of the oranges, lemons, and other citrus fruits, or the individual or smaller shippers. That the payment of these rebates was in violation of the provisions of the act of Congress referred to, and in direct violation of the joint tariff rates in force at the time between the parties thereto, as hereinabove stated, and was made expressly for the sole and only purpose of controlling the routing of oranges, lemons, and other citrus fruits from points of connection with the lines of railroad of the defendants named in the petition, or of railroads connecting therewith. * * * That prior to November 15, 1899, defendants named in the petition and over 150 other common carriers of freight and passengers made and entered into a joint tariff agreement known as the 'East-Bound Joint Tariff of Class and Commodity Rates,' which was and did become effective November 15, 1899, whereby through joint tariff rates for the shipment of oranges, lemons, and other citrus fruits from southern California points to all points east, north, and south of California, by rail, were made, and established to certain common points in the United States to which such traffic is generally shipped, and which joint tariff rates to such common points outside of the state of California were and are less than the sum of the local rates over the different lines of roads from California to such points as the joint tariff rates apply to; and that *to stop the paying of rebates*, as aforesaid, and the demoralization growing out of such practice, and to permit the carriers receiving and loading the traffic referred to, at the initial points of shipment, to make such arrangement with the connecting lines as would enable them to the best advantage to have the fruit cars engaged in this traffic returned over their lines loaded with freight, and in order to enable the initial carrier to have a prompt and speedy return of such cars from connecting carriers, and a prompt and speedy settlement of all claims for damages between the carriers, or between the carriers and shippers, it was agreed by the several carriers joining in said joint rate agreement that as one of the conditions for the shipment of any traffic under the joint tariff rates to any point outside of the state of California over the initial lines and any other lines connecting with such initial lines, or connecting with lines connecting with such initial lines to which

shipments *was* made under such joint tariff agreement, the routing of such shipments should be unqualifiedly given to and reserved by the initial carrier. This rule was made effective on and after January 1, 1900, and pursuant to the agreement between the said common carriers, which were parties to said joint tariff, this defendant has refused and does refuse to accept or receive shipments in car load lots of the citrus fruits referred to, for points on the lines of other carriers, subject to the joint rate agreement, at the joint tariff rate, except upon the condition and agreement that the initial carrier shall control the routing of the same where there is more than one route, made by two or more lines, to the point of destination.

"This defendant further avers: That the enforcement of this rule and practice at once ended the paying of rebates as aforesaid, *and enabled all the parties to the joint tariff rate agreement to observe the joint tariff rates without any secret cutting or reduction of the same by the payment of rebates or otherwise.* That on January 18, 1900, a new joint traffic agreement was made between defendants and the various other common carriers hereinbefore referred to for the routing of east-bound class and commodity freight from southern California east, which also required by the agreement making such joint rate, as one of the conditions upon which the joint rates should be made and maintained, that the initial carrier should have the absolute right of routing shipments to points outside of the state of California, when they were reached by two or more carriers joining in the joint rate tariffs.

"This defendant further avers: That the joint tariff rates established as aforesaid, and filed with the complainant herein, and referred to in the report and decision of the complainant, attached to its petition, were based and made upon the condition (among others) last above stated. That no agreement was made or entered into between defendants and any other carrier or carriers since November 15, 1899, whereby any joint tariff rates were made, or to be made or maintained, except that they were based upon the condition stated."

Complainant contends, among other things, that said routing provision makes the agreement for said joint tariff, of which it is one of the conditions, a contract or combination for pooling of freights of different and competing railroads, within the meaning of section 5 of the commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]), which is as follows:

"Sec. 5. That it shall be unlawful for any common carrier subject to the provisions of this act to enter into any contract, agreement or combination with any other common carrier or carriers for the pooling of freights of different and competing railroads, or to divide between them the aggregate or net proceeds of the earnings of such railroads, or any portion thereof; and in any case of an agreement for the pooling of freights as aforesaid, each day of its continuance shall be deemed a separate offense."

The question here presented is not whether there was a tonnage pool between the connecting carriers, to which the defendants, although they promoted its ends through the use of the routing rule, were not parties, as was found by the commission (see my opinion herein on demurrer, 123 Fed. 602), nor whether there was a traffic pool between the defendants, to which the connecting carriers were not parties, which was one of the issues the commission, for lack of satisfactory evidence, retained for further investigation, but whether or not the routing provision, which the evidence adduced on final hearing shows, and the answers of the defendants admit, to have been part of the agreement between the defendants themselves and their Eastern connections, and pursuant to which their subsequent joint tariffs were filed with the commission, is itself a contract or combination for the pooling of freights. The contention of the Southern Pacific Company that this question

is eliminated from the case by the conclusions of the commission, and "that the sole question * * * is the undue discrimination vel non of the alleged routing rule, and nothing else," is, it seems to me, without merit.   The commission declares the violation of the commerce act in general terms as follows:

"Our conclusion is that the practice of the defendant carriers in denying to the shippers the use of their transportation facilities by the established routes is in violation of the statute," etc.  Report of Commission, 206d.

Paragraph 11 of the complaint herein, although it gives some specifications, employs other terms, which amount to a general allegation, that said rule is violative of the commerce act, and said defendant, so interpreting the complaint, denies in paragraph 2 of its answer the general allegation.   The issue thus raised extends to every possible violation of said act, and in passing upon said issue the court is not confined to the grounds or reasons assigned by the commission for its conclusion, but might, without going beyond the issue, reach a like or different conclusion upon and for the same or other grounds or reasons.   Interstate Commerce Commission v. C., N. O. & T. P. Ry. Co. (C. C.) 56 Fed. 934, 935; K. & I. Bridge Co. v. L. & N. R. Co. (C. C.) 37 Fed. 614, 2 L. R. A. 289; Shinkle, etc., Co. v. L. & N. R. Co. (C. C.) 62 Fed. 693; Interstate Commerce Commission v. Alabama Mid. Ry. Co., 168 U. S. 175, 18 Sup. Ct. 45, 42 L. Ed. 414.

While it is unquestionably true, as contended by the defendants, that joint tariffs over continuous lines are purely matters of voluntary arrangement between the carriers themselves, about which they may specially contract, yet this power of contracting, of course, is subject to all the prohibitions of the commerce act, as well those against pooling as those against unjust charges and discriminations.   Section 5 of the commerce act, above quoted, makes it unlawful for the common carriers therein mentioned to enter into any contract, agreement, or combination among themselves—First, for the pooling of freights of different and competing railroads; second, to divide between them the aggregate or net proceeds of the earnings of such railroads, or any portion thereof.   The analysis of said section contended for by the Atchison, Topeka & Santa Fé Railway Company is inadmissible.   According to that contention, the second prohibition of said section is not against a contract to divide earnings, but against the actual division of earnings.   Such a construction is grammatically impossible.   The predicate of the clause "to divide between them the aggregate or net proceeds of the earnings of such railroads, or any portion thereof," is all of the section down to and including the word "carriers" in the third line.   To stop short of the word "carriers," and attempt a connection with the words "to divide," etc., renders the clause incomplete and meaningless.   The section, to properly express the prohibition, or, indeed, to have any meaning whatever, must be read as follows:

"That it shall be unlawful for any common carrier * * * to enter into any contract, agreement or combination with any other common carrier or carriers to * * * divide between them," etc.

Unless the two clauses are thus connected, the relative "them" in the latter is without an intelligible antecedent.

Another objection to defendant's analysis is that it loses sight entirely of the obvious purpose of the section, namely, the safe guarding of competition. The public is in no wise concerned in actual divisions of the earnings of competing railroads, because this does not interfere with their rivalry; but the public is vitally concerned in any contract for the division of future earnings which destroys or weakens competition. United States v. Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007.

The meaning which said defendant attaches to the word "freights" is, in my opinion, also wrong. This meaning is expressed thus:

"The word 'freights' in this clause means, not the commodity or traffic carried, but the receipts or compensation for the carriage thereof. It cannot, evidently, be given both meanings. If it meant only the commodity carried, it would not include passenger business. If, on the other hand, it was meant to include the receipts, it would also include compensation derived from passenger carriage."

The obvious answer to this is that the word "freights" was not intended to include passenger traffic. Such traffic, in the nature of things, cannot be pooled, because its routing depends ultimately upon the will of the passenger. Again, passenger traffic is included in the prohibition against the conventional division of earnings; and, if the word "freights" were given the meaning defendant claims for it, then the first prohibition of the section, the one against pooling freights, would be entirely useless, since its purpose would be fully accomplished by the prohibition against division of earnings. On the other hand, the pooling of freights, in the sense of distributing the commodities to be transported, among the various carriers who are to perform the service, is not reached by a prohibition against the division of earnings.

Defendant quotes several authorities to the effect that the word "freight" means the price to be paid for the carriage of goods. There can be no controversy but that the word, under certain circumstances, is susceptible of that meaning. Indeed, both the Century Dictionary and Webster's Dictionary include it among their definitions, although the first definition given by the Century Dictionary is this:

"(1) The cargo, or any part of the cargo, of a ship; lading; that which is carried by water; in the United States and Canada, in general, anything carried for pay either by water or by land; the lading of a ship, canal boat, railroad car, wagon," etc.

And the first definition given by Webster is substantially the same:

"(1) That with which anything is fraught or laden for transportation; lading; cargo, especially of a ship; also of a car on a railway, or the like; as, a freight of cotton; a full freight; freight will be paid for by the ton."

Defendant rightfully says that the meaning to be ascribed to the word in any given case depends upon the context, and illustrates its statement as follows:

"Thus in the sixth section the phrase is 'in every depot * * * of such carrier where passengers or freight, respectively, are received for transportation.' There the word 'freight,' in connection with the words 'are received for transportation,' would mean the commodity carried. But in that sense it would not include passengers, and the result would then follow that an agreement for pooling the commodities carried, if 'freight' were so used, would be prohibited, while an agreement for pooling passenger traffic would not be."

Said illustration is apt, and the deduction therefrom in harmony with what I have already shown, that passengers cannot, like commodities, be pooled for transportation, and hence passenger traffic is included in the prohibition against division of earnings, not in the prohibition against freight pools.

Defendant further says, in the same connection:

"Again, the word 'freight,' when intended to mean the traffic or commodities carried, is comprehensive in its scope, and the singular, instead of the plural—'freights'—should be properly used in that connection."

This argument is refuted by the commerce act itself, which, in section 7 (Act Feb. 14, 1887, c. 104, 24 Stat. 382 [U. S. Comp. St. 1901, p. 3159]), uses the plural, "freights," in the very connection in which defendant asserts the singular, "freight," should be used; said last named section being as follows:

"That it shall be unlawful * * * to prevent * * * the carriage of freights from being continuous; * * * and no break of bulk shall prevent the carriage of freights from being," etc.

It should be borne in mind that railroads may pool their freights—that is, the commodities they carry—in two ways: First, by distributing the commodities between themselves for carriage; second, by dividing among themselves their aggregate earnings on the commodities carried. Obviously a prohibition against division of earnings does not include the first class of freight pools, and this explains why section 5 of the commerce law (24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]), although adopting some of the features of section 2 of the original Reagan bill, as shown in defendants' brief, omits the words "or to pool the freights," which were contained in said section 2, and for the words "by dividing," also contained in said section 2, substitutes the words "or to divide," thus showing that it is the purpose of the commerce law to prohibit, not only earnings pools, but also traffic pools.

Defendant further says, in this connection, at page 110 of said brief:

"The word 'pool,' however, used in connection with freights, would be an awkward word to cover a mere division of traffic. In such a case there would be no pool, in the ordinary acceptation of that term."

Defendant then proceeds to quote definitions from Webster and the Standard Dictionary, which do not expressly include divisions of traffic. The Century Dictionary, however, defines the word "pool" thus:

"A combination intended by concert of action to make or control changes in market rates."

This general definition the same authority specially illustrates thus:

"(b) A combination of the interests of several otherwise competing parties, such as rival transportation lines, in which all take common ground as regards the public, and distribute the profits of the business among themselves equally, or according to special agreement. In this sense pooling is a system of reconciling conflicting interests, and of obviating ruinous competition, by which the several competing parties or companies throw their revenue into one common fund, which is then divided or redistributed among the members of the pool on a basis of percentages or proportions previously agreed upon or determined by arbitration."

For judicial approval of this lexicographical exposition, see In re Pooling Freights (D. C.) 115 Fed. 588.

Obviously the general definition above quoted is broader than the special· illustration, and I can conceive of no particular wherein the contract for routing by the initial carrier falls short of said definition. Said contract shows upon its face a combination intended by concert of action to make and control changes in market rates, and, besides, defendants' own witnesses testify to such intention in unmistakable language. Said routing contract fulfills, I think, the spirit, if not the letter, of the special illustration, since it may be fairly considered, in the language of said illustration, "a combination of the interests of several otherwise * . * * rival transportation lines, in which all take common ground as regards the public, and distribute the profits of the business among themselves * * * according to special agreement"; the special agreement being the routing provision, which, by allowing the initial carrier to apportion the freights among its connecting lines, in effect leaves to the arbitrament of such carrier the distribution of profits, and certainly destroys, so far as shippers are concerned, all competition between the connecting lines. Whether this be true or not, however, said routing contract unquestionably comes within the general definition above quoted. Neither under the general definition nor special illustration is it necessary to a traffic pool that the contract or agreement should fix the percentages of freights the several railroads are to receive, or that the railroads should know in advance what the per-- centages will be. It is sufficient in this respect, to constitute a pool, if the contract or agreement provides any special means or agency for apportioning the freights, which destroys the rivalry that would otherwise exist between the railroads; and an agreement by which the apportionment is left "absolutely and unqualifiedly" to the will of the initial carrier accomplishes this, and as effectually as though definite percentages were fixed in the contract.

But it is said that under the present routing arrangement the initial carriers look to efficiency of service in apportioning freights, and hence there is competition in every respect except rate. The exception is fatal to the argument, because the prohibition of section 5 against pooling freights protects competition in rate as well as in service. Another answer, however, equally conclusive, is that, said section being in the interests of shippers, the competition it protects is that which reaches and appeals directly to shippers, not to arbiters chosen by and from among the very railroads which occupy common ground as regards the shippers. No provision for different competition can justify the destruction of that for which the law provides.

There is no escape from the conclusion, it seems to me, that said routing contract is a pool, and the remaining question is whether or not it is such a pool as the commerce act makes unlawful. Section 5 of said·act does not denounce all pools of freights, but only those between different and competing railroads. A joint tariff of through rates between noncompeting railroads, forming a continuous line, although an earnings pool, under the general definition of the word "pool"—"a combination intended by concert of action to make or control market rates"—is not within the prohibition of said section 5, but, on the contrary, its legality is recognized by the provisions of section 6 of said act. But if there is, in the present case, any fact emphasized and made spe-

cially prominent by defendants, it is that fierce rivalry existed between their Eastern connections before the routing rule was adopted, and the fact so emphasized, that said connections are competing railroads, together with the other facts already found, bring the routing provision, it seems to me, beyond question, within the express denunciation of section 5.

Not only, however, is the routing rule a pooling arrangement within the letter of said section, but said rule is against the spirit of the commerce act. That act prohibits only pools of competing railroads, and the sole object of suppressing such pools was to protect the competing relation, and any and every arrangement or device intended to destroy, and which does destroy, that relation, whether expressly named in the act or not, contravenes its policy. Since defendants' plan to maintain their rates through the operation of the routing rule necessarily involved the destruction of competition, it is idle to say that that result was not intended by them. The sole immediate aim of the routing rule was to put the shippers of citrus fruit in a position where their patronage could not possibly be competed for by defendants' Eastern connections, and Mr. Morton himself explains the matter briefly, but with great clearness, in the following extracts already quoted from his testimony:

"Q. If the initial carrier assumed the routing of the shipment, the connecting carrier would be in no position to bid for the business of a connecting line, would it? A. No. When we took the routing of the business into our hands, the Eastern connections had to do business with us, instead of the car company or the shipper."

But defendants say that the competition which the routing rule was intended to suppress was not legitimate business competition, but "rebate competition," and that the commerce act itself denounces such competition. Said rule, however, not only strikes down rebates, but destroys all the competition which section 5 of the commerce act was designed to protect, namely direct competition both in rate and service for the patronage of shippers. Nor will defendants be heard, in justification of said rule, to say that its operation has been more far-reaching than they purposed. The destruction of competition was not only inevitable from the rule, but so plainly heralded by its terms that no gift of prophecy was needed to foretell the result. It could not have been otherwise than obvious to the commonest understanding. The truth is, as testified to by numerous witnesses, that the chief purpose of defendants in entering into the routing contract was to maintain the joint tariff rates. No doubt the rebate system was a menace, and perhaps the most dangerous one, to said rates; but there were also others, some of them enumerated in section 2 of the commerce act. Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3155]. Established rates could not be maintained while defendants' Eastern connections were able, as competitors, to directly approach shippers for their freights, and the routing rule was resorted to for the purpose of destroying that competition, which, as already shown, is the very competition section 5 of the commerce act was designed to safeguard.

Moreover, defendants' contention that the commerce act denounces "rebate competition" is an erroneous construction of the act. The prohibition against rebates is appropriately placed in section 2 of said act, which forbids the various devices, naming some of them, rebates among others, by which one person may be subjected to a higher rate for contemporaneous and similar service in transportation than another, and rebates are there and thus denounced, not on account of the competition they indicate, but because they are the secret and pernicious instrumentalities of discrimination. The proposition that the commerce act favors reasonable, or any, restraints upon competition, is wholly untenable. Judge Shiras, in his dissenting opinion in United States v. Trans-Missouri Freight Association, 58 Fed. 93, 7 C. C. A. 97, 24 L. R. A. 73, says:

"The interstate commerce act did not materially change the rights pertaining to the public. It created certain machinery for the better enforcement and protection of the public interests, but the rights to be protected were already in existence, and the statute in this respect is only declaratory of common law principles. Before the enactment of that statute, railway companies were recognized to be public corporations, charged with the duties and obligations pertaining thereto. As common carriers they were under legal obligation to deal with the public, and to afford equal facilities to every citizen, and they were only entitled to demand reasonable, and not exorbitant, compensation for the services rendered by them. The purpose of the interstate commerce act was not so much to change the legal rights of the common carriers and of the public as it was to compel a change in the practices of the railway companies, and to enforce compliance on their part with the duties and obligations which rested upon them under the principles of the common law. The line of argument followed by the majority seems to assume that the main purpose of the interstate commerce act is to regulate the relations between the competing lines of railway, and to protect the weaker lines of railway and the capital invested therein from being absorbed by the stronger competitor. That there are evils of this nature of great magnitude is not to be denied, but the interstate commerce act was not enacted for their eradication. The primary purpose of that act was to deal with the relations existing between the common carriers and the public, and to enforce the rights of the latter. Experience had shown that railway companies had in many instances favored particular localities or particular parties or particular classes of business at the expense of the community at large, and the act was, in the language used by the Supreme Court in Railway Co. v. Goodridge, 149 U. S. 680, 13 Sup. Ct. 970, 37 L. Ed. 986, intended 'to cut up by the roots the entire system of rebates and discriminations in favor of particular localities, special enterprises, or favored corporations, and to put all shippers on an absolute equality.' The uniformity and equality of rates sought to be secured by that act are not between the schedules of rates charged by the several companies, but between the charges actually made by each railway company to its patrons. The act does not require the schedule of rates adopted by one company to conform to that of a rival company. What it does demand of such company is that, in dealing with its customers, it shall make no unjust discrimination, but shall, for the like service performed under similar circumstances, charge the same rate to all. The act provides that all charges for the transportation of persons or property from state to state shall be reasonable and just, but no standard for ascertaining whether a given rate is reasonable or not is established by the act. I fail, therefore, to perceive the force of the argument that the adoption of the interstate commerce act worked a radical change in the relations existing between railway companies and the public, and that one effect thereof was to authorize the former to combine together for the purpose of escaping the effect of competition upon the rates to be charged the public for the services rendered."

Again, at page 95, 58 Fed., page 99, 7 C. C. A., 24 L. R. A. 73, he says:

"I had always supposed that the enactment of the interstate commerce statute was the result of a popular demand, which insisted upon relief being given to the community as against the methods pursued by the railway companies, which, in some particulars at least, were deemed to be inimical to the public interests. Looking at the causes which brought about the enactment of this statute, and the evils at which it was aimed, it does seem clear that it is wholly wrested from its purpose when it is held that it creates numerous radical and effective changes in the public policy of the nation touching competition between railroad companies engaged in interstate commerce. For the better protection of the rights of the public, and to sweep away the system of discriminations in favor of localities, individuals, or classes of business which had come into vogue, the interstate commerce act was intended to introduce radical changes in railway methods; but it never was intended to curtail the rights of the public and enlarge those of the railway corporations in any substantial particular. The argument of the majority is that, even if it were admitted that under common-law principles all contracts or combinations between public common carriers for the establishment of rates would be held to be contrary to public policy, nevertheless the enactment of the interstate commerce act revolutionized the law in this particular, and authorized railway companies to enter into combinations for the purpose of establishing reasonable restrictions upon the freedom of interstate commerce. Reading that act in the light of the causes leading to its enactment, I cannot find in any of its provisions foundation for the theory that it was intended to confer upon railway companies the right to enter into combinations which, under the principles of the common law, would be illegal, because contrary to public policy."

Concerning this opinion of Judge Shiras, the Supreme Court say:

"The whole opinion is a remarkably strong presentation of the views of the learned judge who wrote it." 166 U. S. 838, 17 Sup. Ct. 540, 41 L. Ed. 1007.

The opinion of the Court of Appeals, written by Judge Sanborn and concurred in by Judge Thayer, but dissented from by Judge Shiras, in the same case (58 Fed. 58), cited by the Southern Pacific Company in its brief, proceeds largely on an asserted distinction between contracts which merely restrict, and those which destroy, competition, holding the former, if the restraints are reasonable, legal, and the latter illegal. The court says, at page 69, 58 Fed., page 73, 7 C. C. A., 24 L. R. A. 73:

"The main purpose of contracts of these classes that are thus held illegal is to suppress, not simply to regulate, competition; and, if suppression is not effected, it is because the contracts fail to accomplish their purpose. It is evident that there is a wide difference between such contracts and those the purpose of which is to so regulate competition that it may be fair, open, healthy, and whose restriction upon it is slight, and only that which is necessary to accomplish this purpose. It does not necessarily follow that contracts of the latter class constitute illegal restraints of trade because those of the former classes do."

And at page 70, 58 Fed., page 74, 7 C. C. A., 24 L. R. A. 73:

"It was natural that in the discussion of contracts of these classes the courts should condemn in unmeasured terms the suppression of competition, but in none of these cases were they required to hold, and in none of them did they hold, as we understand the opinions when read in relation to the facts of the cases, respectively, that every restriction of competition by contracts of competing dealers or carriers was illegal. These decisions rest upon broader ground—on the ground that the main purpose of the obnoxious contracts was to suppress competition, and that they thus tended to effect an unreasonable

and unlawful restraint of trade. They rest on the well-settled rules, and come within the well-defined classes, to which we have above referred."

And at pages 72 and 73, 58 Fed., pages 74, 76, 77, 7 C. C. A., 24 L. R. A. 73:

"From a review of these and other authorities, it clearly appears that when the anti-trust act was passed the rule had become firmly established in the jurisprudence of England and the United States that the validity of contracts restricting competition was to be determined by the reasonableness of the restriction. If the main purpose or natural and inevitable effect of a contract was to suppress competition or create a monopoly, it was illegal."

Moreover, the opinion of the court clearly implies, although it does not so state in term, that contracts, illegal upon general principles because they suppress competition, are contrary at least to the spirit of the commerce act, as shown by the following extract quoted from pages 65, 66, 58 Fed., pages 69, 70, 7 C. C. A., 24 L. R. A. 73:

"Contracts between competing corporations, commonly termed 'pooling contracts,' to divide their earnings from the transportation of freight in fixed proportions, have long been held void by the courts as against public policy. Such contracts do not simply restrict competition. They tend to destroy it; and, if they do not effect that result, it is only because they do not completely accomplish their main purpose. When acting independently, the spur of self-interest drives each corporation to furnish the people with the best accommodations and the safest and most rapid transportation at the lowest profitable rates, in order that it may attract larger patronage and gather increased gain. But under the operation of a pool this incentive to exertion is withdrawn. Each carrier finds it to its interest to enhance the price of carriage, and finds that its profits are not sensibly diminished by furnishing poor facilities for transportation and inexpensive and mean accommodations. In 1887 Congress recognized and adopted this rule of public policy, and by section 5 of 'An act to regulate commerce' (Act Feb. 4, 1887, c. 104, 24 Stat. 379; Rev. St. Supp. 529 [U. S. Comp. St. 1901, p. 3154]) prohibited such contracts between common carriers engaged in interstate or international commerce. That act, however, prohibited contracts for the pooling of freights of different and competing railroads only. It prohibited contracts that thus destroyed competition; but it did not prohibit all contracts that in any way restricted or regulated competition."

In order to determine, however, the authoritative force of any part of the opinion in the case last cited, due regard must be had to the history of the case, which may be epitomized thus: The bill was dismissed by the Circuit Court (53 Fed. 440), and the decree of that court affirmed by the Circuit Court of Appeals for the Eighth Circuit (58 Fed. 58, 7 C. C. A. 15, 24 L. R. A. 73); but the decrees of both of these courts were reversed by the Supreme Court (166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007), and in its opinion the Supreme Court rejects the conclusions of the other courts, based on the distinction to which I have already adverted, that the commerce act recognizes the lawfulness of reasonable restraints upon competition, in the following language, partly quoted in the brief of the Atchison, Topeka & Santa Fé Railway Company:

"The first answer to this argument is that, in our opinion, the commerce act does not authorize an agreement of this nature. It may not in terms prohibit, but it is far from conferring either directly or by implication any authority to make it. If the agreement be legal, it does not owe its validity to any provision of the commerce act; and, if illegal, it is not made so by that act. The fifth section prohibits what is termed 'pooling,' but there is no

express provision in the act prohibiting the maintenance of traffic rates among competing roads by making such an agreement as this, nor is there any provision which permits it. Prior to the passage of the act the companies had sometimes endeavored to regulate competition and to maintain rates by pooling arrangements, and in the act that kind of an arrangement was forbidden. After its passage other devices were resorted to for the purpose of curbing competition and maintaining rates. The general nature of a contract like the one before us is not mentioned in or provided for by the act."

No such situation, it should be borne in mind, was before the court there as is here presented, namely, a traffic pool, or, more specifically a contract for the distribution of freight between different and competing railroads by arbitrary routings of the initial lines, regardless of the wishes of the shippers. Furthermore, the Supreme Court quotes approvingly from Judge Shiras' dissenting opinion in that case, as follows:

"As to the majority of the community living along its line, each railway company has a monopoly of the business demanding transportation as one of its elements. By reason of this fact the action of this corporation in establishing the rates to be charged largely influences the net profit coming to the farmer, the manufacturer, and the merchant from the sale of the products of the farm, the workshop, and manufactory, and of the merchandise purchased and resold, and also largely influences the price to be paid by every one who consumes any of the property transported over the line of railway. There is no other line of business carried on in our midst which is so intimately connected with the public as that conducted by the railways of the country. * * * A railway corporation engaged in the transportation of the persons and property of the community is always carrying on a public business, which at all times directly affects the public welfare. All contracts or combinations entered into between railway corporations, intended to regulate the rates to be charged the public for the service rendered, must of necessity affect the public interests. By reason of this marked distinction existing between enterprises inherently public in their character and those of a private nature, and, further, by reason of the difference between private persons and corporations engaged in private pursuits, who owe no direct or primary duty to the public and public corporations created for the express purpose of carrying on public enterprises, and which, in consideration of the public powers exercised in their behalf, are under obligations to carry on the work intrusted to their management primarily in the interest and for the benefit of the community, it seems clear to me that the same test is not applicable to both classes of business and corporations in determining the validity of contracts and combinations entered into by those engaged therein. * * * In the opinion of the court are found citations from the reports of the Interstate Commerce Commission in which are depicted the evils that are occasioned to the railway companies and the public by warfares over rate charges, and the advantages that are gained in many directions by proper conference and concert of action among the competing lines. It may be entirely true that, as we proceed in the development of the policy of public control over railway traffic, methods will be devised and put in operation by legislative enactment whereby railway companies and the public may be protected against the evils arising from unrestricted competition and from rate wars which unsettle the business of the community; but I fail to perceive the force of the argument that, because railway companies through their own action cause evils to themselves and the public by sudden changes or reductions in tariff rates, they must be permitted to deprive the community of the benefit of competition in securing reasonable rates for the transportation of the products of the country. Competition, free and unrestricted, is the general rule which governs all the ordinary business pursuits and transactions of life. Evils, as well as benefits, result therefrom. In the fierce heat of competition the stronger competitor may crush out the weaker; fluctuations in prices may be caused that result in wreck and disaster; yet, balancing the benefits as against the evils, the law of competition

remains as a controlling element in the business world. That free and unrestricted competition in the matter of railroad charges may be productive of evils does not militate against the fact that such is the law now governing the subject. No law can be enacted nor system be devised for the control of human affairs that in its enforcement does not produce some evil results, no matter how beneficial its general purpose may be. There are benefits and there are evils which result from the operation of the law of free competition between railway companies. The time may come when the companies will be relieved from the operation of this law; but they cannot, by combination and agreements among themselves, bring about this change. The fact that the provisions of the interstate commerce act may have changed in many respects the conduct of the companies in the carrying on of the public business they are engaged in does not show that it was the intent of Congress, in the enactment of that statute, to clothe railway companies with the right to combine together for the purpose of avoiding the effects of competition on the subject of rates." 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007.

After careful consideration of the subject, I am of opinion that any contract, agreement, or combination between different and competing railroads, whereby the volume or quantity of freights each or any shall receive for transportation is to be determined by or through any conventional means or agency which was intended to and does suppress competition, either in rate or service or competition directly addressed to shippers, is a traffic pool, within the meaning of section 5 of the commerce act, and that the routing contract here in controversy does so apportion freights among the defendants' Eastern connections, and is essentially such a pool.

Defendants' contention that the order in controversy is unlawful, because legislative in its character, is not well taken. The routing rule or regulation, although embodied in the joint tariff, and therefore a contractual provision between the common carriers who are parties to said tariff, is also in effect a declaration to the public that the practice for which said rule or regulation provides will be followed by the initial carriers, and the order of the commission does nothing more than forbid this unlawful practice, while the injunction prayed for is but the ordinary equitable remedy against a threatened mischief. In Interstate Commerce Commission v. Railway Company, 167 U. S. 479, 17 Sup. Ct. 896, 42 L. Ed. 243, cited by defendant in this connection, the court simply held that the power to prescribe rates for carriage by a common carrier is not an administrative or judicial, but a legislative function, and has not been conferred upon the Interstate Commerce Commission. In the present case, however, the commission does not undertake to prescribe rates, or any other rule of action, but simply performs the plain judicial function of directing the defendants to desist from an unlawful practice which they have publicly declared their intention to pursue, and in which they are now engaged. The case last cited, therefore, has no application to the case at bar.

The Supreme Court, however, in a sentence which concludes its opinion and immediately follows a clause quoted from said opinion in defendants' brief, states the law in terms peculiarly applicable here, as follows:

"The Legislature may impose a duty; and when imposed it will, if necessary, be enforced by the courts; but, unless a duty has been created, either

by usage, or by contract, or by statute, the courts cannot be called on to give it effect." Express Cases, 117 U. S. 29, 6 Sup. Ct. 542, 29 L. Ed. 791.

Section 5 of the commerce act, by declaring unlawful certain contracts, agreements, and combinations therein mentioned, makes it the duty of common carriers to refrain from entering into such contracts, agreements, or combinations, and the enforcement of this duty is clearly a judicial function. The Supreme Court has heretofore sanctioned an order somewhat similar to the one here involved. Cincinnati, N. O. & T. P. Ry. Co. v. Int. Com. Com., 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935.

With reference to the designed and actual effect of the routing rule upon the practice of rebates, which is strongly urged in behalf of said rule, it is only necessary to quote here from my opinion on the demurrer (123 Fed. 602) as follows:

"It is no justification of said rule and practice that they are designed to prevent, and do prevent, unlawful rebates from connecting lines to shippers. Pooling and rebates are both within the prohibitions of the interstate commerce act, and one cannot be employed as a preventive of the other."

On this same line the defendants also contend that routing by the initial carrier, besides breaking up the unlawful and vicious practice of rebates, is also to the best interests of the shipper, in that it tends to secure an efficient and advantageous service from the connecting carriers, not otherwise attainable, in expeditious handling of freights, by speedy return of cars, prompt settlement of claims for losses, better results from the use of refrigerator cars, etc. This argument, however forcible it might be if addressed to Congress in support of proposed amendments to the commerce act, cannot be effectual with the courts, whose duty it is to administer, not change, existing laws.

Defendants' contention that the order of the commission is broader than its findings and conclusions cannot be maintained. The order relates only to the routing provision of the joint tariff on citrus fruits, filed by defendants and their Eastern connections with the commission, and does not purport to interfere with routing by an initial carrier in any other case.

With reference to defendants' contention, that the complainants before the Interstate Commerce Commission were there with unclean hands, it is only necessary to say that in this court the commission represents the public at large, and therefore no participation by said complainants in the unlawful practice of rebates could bar relief here.

My conclusions on the pooling issue render it unnecessary for me to pass upon any of the other questions which have been raised in the case. The defendants will be enjoined from disobedience of said order, and complainant's solicitors are requested to prepare and submit a suitable form of decree.